UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

      *vs.*                        Case No. 13CR192 (RTR/WEC)

MARIANO MEZA,

      Defendant.

## DEFENDANT'S SECOND PRETRIAL MOTION: MOTION TO DISMISS THE INDICTMENT

Mariano Meza, by counsel, moves to dismiss the one-count indictment alleging a violation of 18 U.S.C. § 922(g)(5). In support, he submits the following:

The government alleges that Meza is an alien illegally or unlawfully in the United States and that he possessed ammunition—one .22 caliber cartridge. On October 8, 2013, he was charged in a one-count indictment with violating 18 U.S.C. § 922(g)(5). In response, Meza files this motion to dismiss the indictment making both a facial and an as-applied constitutional challenge to the statute. The facial challenge explains that the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment. The as-applied challenge contends that the ban in § 922(g)(5) violates Mr. Meza's Second

Federal Defender Services<br/>of Wisconsin, Inc.

Amendment rights.[1]  Should the court find that the Second Amendment protects the

rights of illegal aliens to possess firearms and ammunition, then the defense requests

an evidentiary hearing for the government to produce evidence that the ban in

§ 922(g)(5) survives some form of heightened scrutiny.

1.0 Questions Presented:

In resolving his motion, the court must answer two questions:

The Second Amendment provides that "the right of the people to keep
and bear Arms, shall not be infringed."The First, Second and Fourth
Amendments all use the term "the people," and courts have uniformly
held that the protections of the First and Fourth Amendments extend
to illegal aliens.  When the Second Amendment uses the identical term
"the people" does it also extend its protections to illegal aliens?

The Second Amendment protects the long-standing and pre-existing
right of the people to bear arms. Section 922(g)(5)'s absolute prohibition
for illegal aliens infringes on that right. When a statute infringes on a
constitutional right, the government must establish that it passes some
form of heightened scrutiny. Is the complete ban on illegal aliens
possessing a gun closely related to a compelling governmental interest?

2.0 "The People" referenced in the Second Amendment Are the Same
"People" Referenced in the First and Fourth Amendments.

The Second Amendment, like the First and Fourth Amendments, protects an

individual, pre-existing "right of the people" that "shall not be infringed." *District

of Columbia v. Heller*, 554 U.S. 570, 592 (2008). That is, the right existed at common

law before the Bill of Rights: "[The right to bear arms] is not a right granted by the

---

[1] Though no case has addressed whether the Second Amendment applies to
ammunition, the right to bear arms means little if they must remain unloaded.

Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank*, 92 U.S. 542, 553 (1876). Rather, the Constitution acknowledges and protects that right, and it does so for "the people." U.S. Const. amend. II.

"The people" is a term of art used in the Bill of Rights, and many courts have found that "the people" referenced in the First, Second, and Fourth Amendments are the same "people"—that is, the term means the same thing in each amendment. *United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Parker v. District of Columbia*, 478 F.3d 370, 381 (D.C. Cir. 2007); *Nordyke v. King*, 364 F.3d 1025, 1028–29 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing en banc). In *Emerson*, the Fifth Circuit held that "[t]here is no evidence in the text of the Second Amendment, or any other part of the Constitution, that the words 'the people' have a different connotation within the Second Amendment than when employed elsewhere in the Constitution."

Courts draw that understanding from the language, structure, and purpose of the three Amendments. *Id.* Of course, the First, Second, and Fourth Amendments were ratified at the same time. And they all serve the same purpose: to limit government infringement of a right that existed before the ratification of the Constitution. In doing so, each Amendment also recognizes who posses that right—it is "the right of the people."

The First Amendment: "Congress shall make no law . . . abridging . . . *the right of the people* peaceably to assemble, and to petition the government for a redress of grievances."

The Fourth Amendment: "*The right of the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

The Second Amendment: "*[T]he right of the people* to keep and bear Arms shall not be infringed."

As with any statute or contract, the use of identical phrasing within the Constitution is not a coincidence. *See Parker*, 478 F.3d at 382; *see also Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning" (quotation omitted)). The Supreme Court recognized that fact in *United States v. Verdugo-Urquidez*, stating: "'the people' seems to have been a term of art employed in select parts of the Constitution," referring to those who are "protected by the Fourth Amendment, and by the First and Second Amendments." 494 U.S. 259, 265 (1990). Seizing on this shared usage and purpose, several Circuit Judges writing in dissent from en banc review observed that: "[I]t is hard to imagine that the drafters of the Constitution meant 'the people' in the Second Amendment to take on a meaning different from the meaning ascribed to that term throughout the rest of the Bill of Rights." *King*, 364 F.3d at 1028–29 (Gould, J., dissenting from denial of rehearing en banc). And in *Heller* the Supreme Court reaffirmed this understanding: "the term unambiguously

refs to all members of the political community, not an unspecified subset." 554 U.S. at 580.

2.1. "The People" Are Those With a Substantial Connection to the Country

The seminal case ascribing a precise meaning to the term "the people" arose in the context of a Fourth Amendment claim. *See Verdugo-Urquidez*, 494 U.S. at 265. There the Supreme Court found: "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265; *see also Heller*, 554 U.S. at 580 (discussing *Verdugo-Urquidez*). In *Verdugo-Urquidez*, the defendant's home in Mexico was searched shortly after he was arrested and brought to America. 494 U.S. at 262. He claimed that the Fourth Amendment's protections extended to his home in Mexico. The Supreme Court rejected that argument, but before doing so, it gave a detailed analysis of the Fourth Amendment and the term "the people."

No clear holding emerged from *Verdugo-Urquidez* definitively establishing who qualifies as "the people" and who does not. But the five Justices that formed the principal opinion held that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections

with this country." *Id.* at 271. An alien establishes "substantial connections" when he (1) is voluntarily present in the United States and (2) "accept[s] some societal obligations." *Id.* at 273. There is some debate about whether that definition is too limited, and the concurring opinion supports a more expansive view. *Id.* at 276 (Kennedy, J. concurring); *see also Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 624–25 (5th Cir. 2006) (recognizing and discussing this tension). But at this point the argument is purely academic: the "substantial connections" test governs. Therefore to qualify for the protections of those three amendments an alien must have "substantial connections" to this country. *See Verdugo-Urquidez*, 494 U.S. at 271-73.

2.2 The Bill of Rights Extends to Aliens In Many Contexts, Including the Second Amendment.

The idea that the Bill of Rights extends to aliens—here legally or not—is not novel. The Supreme Court has noted that illegal aliens are part of our common fabric: there are "millions of aliens who are unlawfully present in the United States [who] are part of American society." *See Plyler v. Doe*, 457 U.S. 202, 219 (1982). And the First and Fourth Amendments apply just the same to such individuals as they do every citizen. As the Supreme Court noted in 1939: "It has been explicitly and repeatedly affirmed by this Court, without a dissenting voice, that freedom of speech and of assembly for any lawful purpose are rights of personal liberty secured to all persons, *without regard to citizenship*, by the due process clause of the Fourteenth Amendment." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 519 (1939)

(per curiam, opinion of J. Stone) (emphasis added); *see also Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). Courts have come to the same conclusion with the Fourth Amendment: "Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *see also United States v. Garcia-Garcia*, 633 F.3d 608, 609 (7th Cir. 2011) (applying a Fourth Amendment analysis to an illegal alien without any discussion or dispute as to whether that alien was protected by the Fourth Amendment). Illegal aliens are also protected by the constitution in other contexts, such as under the Fifth and Sixth Amendments. *Verdugo-Urquidez*, 494 U.S. at 271 (collecting cases).

2.3 Meza Has Substantial Connections to the United States

Just as illegal aliens can claim the protection of the First and Fourth Amendments because they are part of the "the people," so too can they claim the guarantees of the Second Amendment. The next question is whether Meza, as a non-citizen, is among "the people." *Verdugo-Urquidez*, 494 U.S. at 262. As explained above, that depends on whether he has substantial connections to the country: whether he is voluntarily present in the United States and has accepted "some societal obligations." *Id.* at 273.

Here, Meza is a long-time resident of Milwaukee. He attended elementary, middle and high school in the Milwaukee Public Schools. He has two daughters here. His mother lives here. And for all of his adult life he has lived here. Family, school, and work, of course, constitute the most stable and substantial connections that any person can have to a country. Thus, he is among "the people" who the Second Amendment guarantees the right to bear arms.

2.4 Heller's Somewhat Loose Language About Who Has Historically Held That Right Does Not Change the Test.

At points throughout the opinion, the *Heller* majority used imprecise language to identify who the Second Amendment applies to. At various points it described the right-holders as: the "national community," "all members of the political community," "Americans," "citizens," and "law-abiding citizens." *Heller*, 554 U.S. at 580, 581, 625, 629. Some courts have over-read the importance of this language relying on it to find that under the Second Amendment illegal immigrants are not included in "the people."[2] But in reading *Heller*, it's clear that those terms were not used to determine whether aliens have Second Amendment rights—that was not the

---

[2] The Fifth Circuit—with a divided panel—embraced this reading. *United States v. Portillo-Munoz*, 643 F.3d 437, 2011 WL 2306248 (5th Cir. 2011); *but see id.* at \*\*5–9 (Denis, J. dissenting). In a half-page per curiam opinion, the Eighth Circuit followed the Fifth. *United States v. Flores*, 663 F.3d 1022. Though initially the Fourth Circuit remanded a challenge to § 922(g)(5) for the district court to decide what level of scrutiny to apply, *United States v. Guerrero-Leco*, 446 Fed. Appx. 610 (4th Cir. 2011), it eventually concluded that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). *United States v. Lewis*, 2010 WL 337 0754, at \*3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at \*2 (D. Kan. Jan. 28, 2010).

question at issue in *Heller. See United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (refusing to read an unwritten holding into *Heller*: "the question in *Heller* was the amendment's raison d'être—does it protect an individual or collective right?—and aliens were not part of the calculus."). Rather, those descriptions were used throughout the Court's analysis of whether the Second Amendment provided an individual right or a collective right. *Id.* at 580.

Ultimately the Supreme Court concluded that the Second Amendment secures an individual right—just like the First and Fourth Amendments. And the references to "Americans" and "citizens" are not holdings that control or bear on the question of who are "the people." Indeed, the Supreme Court emphasized that *Heller*'s holding was limited. *Id.* at 635 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.") At no time did the Supreme Court address whether a non-citizen is protected by the Second Amendment. That question has been left open and it should be decided in Mr. Meza's favor; just as the First and Fourth Amendment protect illegal immigrants, so too does the Second Amendment.

3.0 Section 922(g)(5) infringes on Meza's Constitutional Right To Bear Arms.

There is no question that § 922(g)(5) abridges Meza's Second Amendment rights—the statute keeps him from possessing a gun. He can't exercise his right to bear arms if he can't possess one. The remaining issue is whether § 922(g)(5) is a

constitutionally permissible restraint of that right. Following the Seventh Circuit's interpretation of *Heller* in *Skoien* and *Williams*, the analysis is two-fold. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). First, is the defendant part of a group that is categorically banned from possessing a firearm? Here, the defendant is—§ 922(g)(5) nullifies the Second Amendment for him and all illegal aliens. Second, can the government show that the categorical ban is constitutional? *Williams*, 616 F.3d at 692 ("But the government does not get a free pass simply because Congress has established a 'categorical ban'; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself.").

3.1. Heightened Scrutiny Must Be Applied.

The extent of the government's burden is determined by the level of scrutiny this Court applies, whether it be strict scrutiny, intermediate scrutiny, some other heightened form, or rational-basis review. This is not an easy question: at this point, unfortunately, there is no clear answer. *Heller* removes rational-basis review from the equation. *See Heller,* 554 U.S. 570, 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). So while it's clear that rational-basis review doesn't apply,

neither *Heller* nor the Supreme Court case that followed, *McDonald v. Chicago*, __ U.S. __, 130 S.Ct. 3020 (2010), identified the proper standard of review for these cases.

Such silence left it for the Circuits to decide. The Seventh Circuit, sitting en banc, side-stepped what it called the "'levels of scrutiny' quagmire." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). It alluded to courts using a "strong showing requirement" but it didn't definitively say what that would be. *Id.* at 641–42. And a couple months later, a Seventh Circuit panel again didn't resolve the question of what level of scrutiny to apply to all challenges to gun restrictions. *Williams*, 616 F.3d 685, 692. Instead, it applied an intermediate-scrutiny analysis, but clearly stated that it was not holding that intermediate scrutiny would always be appropriate. *Id.* Nothing has come along since then that would control what level of scrutiny this Court applies. In the most recent case on the issue, the Seventh Circuit cited *Williams* and noted: "[w]e apply that same analytical framework here, and again reserve the question whether a different kind of firearm regulation might require a different approach." *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010).

3.1.1 Under Any Form of Heightened Form of Scrutiny, § 922(g)(5) Fails.

So, at the very least, this Court must apply a heightened form of scrutiny—something akin to intermediate scrutiny.[3] In *Skoien*, the Court noted that

---

[3] Mr. Marquez-Medina acknowledges that this Court must follow the Seventh Circuit and apply some heightened form of scrutiny, something akin to intermediate scrutiny, but will

"The United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective." 614 F.3d at 641 (en banc).

The ban under § 922(g)(5) is a different sort of beast from the regulations at issue in *Skoien* and *Williams* and *Yancey*. In *Skoien,* the challenged ban on firearm possession was for those convicted of domestic abuse; in *Williams,* the challenged ban was for convicted felons; and in *Yancey,* the challenged ban was for drug users. In a challenge like this, the analysis starts with the nature of the ban: that is, what is the government's objective in creating that ban. *Williams*, 616 F.3d at 693. In *Skoien* and *Williams* the court upheld the ban because there was something inherently dangerous about the class of persons banned—felons and those convicted of domestic violence. While not every felon who cannot possess a firearm is dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands. *Id; Skoien*, 614 F.3d at 642 ("[F]or no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective.") In that way, Congress sought to address a very real harm—armed mayhem— by placing a

---

reserve the right to argue on appeal that it should be strict scrutiny. *But s*ee *United States v. Chester*, 628 F.3d 673, 682–83 (4th Cir. 2010) (holding "we conclude that intermediate scrutiny is more appropriate than strict scrutiny").

categorical ban on a class of persons that as a general matter have posed a danger to society.

The ban at issue in *Yancey* is similar: Congress had a specific objective—namely, "suppressing armed violence." *Yancey*, 621 F.3d at 684. In upholding that ban, the court focused on the close parallels between prohibitions targeting the mentally ill, felons, and habitual drug users. *See id.* ("Keeping guns away from habitual drug abusers is analogous to disarming felons."); *and id.* at 685 ("Moreover, habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."). The possession of a firearm by persons from each group poses a real and self-evident threat to society. *Id.* at 686.

But the same cannot be said of the ban at issue in § 922(g)(5). It can't be said that illegal immigrants as a general class are inherently dangerous. Indeed, the empirical data suggests the opposite.

- Even as the undocumented population has doubled to 12 million since 1994, the violent crime rate in the United States has declined 34.2 percent and the property crime rate has fallen 26.4 percent.[4]
- Among men age 18-39 (who comprise the vast majority of the prison population), the 3.5 percent incarceration rate of the native-born in 2000

---

[4] Rombaut & Ewing, The Myth of Immigrant Criminality and the Paradox of Assimilation: Incarceration Rates Among Native and Foreign-born Men 1, 4 (American Immigration Law Foundation 2007), http://www.immigrationpolicy.org/special-reports/myth-immigrant-criminality-and-para dox-assimilation (last visited March 7, 2012)

was 5 times higher than the 0.7 percent incarceration rate of the foreign-born.[5]

• A study found that first-generation immigrants were 45 percent less likely to commit violence than third-generation Americans, adjusting for individual, family and neighborhood background.[6]

The reality is that illegal immigrants are part of our society. *See Plyler*, 457 U.S. at 219, n.17. They are not a cause of armed mayhem, nor is criminalizing their possession of firearms a step towards preventing armed mayhem. *See Skoein*, 614 F.3d at 642 (noting "preventing armed mayhem, is an important governmental objective"). Without some stated reason that accords with logic, the government cannot sustain its burden and establish that the regulation at issue is substantially related to an important governmental objective. *See Williams*, 616 F.3d at 692 ("To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective.").

And there is nothing in the legislative history that helps the government meet that burden. A variation of § 922(g)(5) was passed as an amendment, Title VII, to The Omnibus Crime Control and Safe Streets Act of 1967. It was not introduced with empirical data—or even any data—establishing a connection between illegal aliens and dangerousness to society. Rather, it came as a last-minute floor amendment

---

[5] *Id.*

[6]Robert Sampson, *Rethinking Crime and Immigration*, 7 Contexts 28, 29 (Winter 2008).

proposed by Senator Long. In *United States v. Bass,* 404 U.S. 336, 344 (1971), the Supreme Court described Title VII as: "hastily passed, with little discussion, no hearings, and no report."[7] The Senator concluded what little explanation he provided with the command: "Several Senators: Vote! Vote!" David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 Cumb. L. Rev. 585, 600-601 n.79 (1986/1987), citing 114 Cong. Rec. 14, 775. And many did just that, without any real discussion, giving us the ban at issue here. *Id.* Eventually the ban found in Title VII was amended in 1986 with the passage of the Firearms Owners' Protection Act, and all prohibited persons were consolidated into a single provision—§ 922(g).

---

[7] In a footnote, the Supreme Court summarized how the amendment squeaked its way through:

> On May 17, 1968, Senator Long introduced on the floor his amendment to S. 917, which he designated Title VII. His introductory remarks set forth the purpose of the amendment. 114 Cong.Rec. 13867—13869. About a week later he explained his amendment once again. There was a brief debate; the reaction was favorable but cautious, with 'further thought' and 'study' being suggested by several favorably inclined Senators who observed some problems with the bill as drafted. Unexpectedly, however, there was a call for a vote and Title VII passed without modification. See 114 Cong.Rec. 14772—14775. The amendment received only passing mention in the House discussion of the bill, 114 Cong.Rec. 16286, 16298, and never received committee consideration or study in the House either.

404 U.S. at 344 n.11.

Federal Defender Services
of Wisconsin, Inc.

It can't be said that all of the bans on firearm possession wrapped into § 922(g) have the same validity. Indeed, in *Heller* the Supreme Court noted that some prohibitions are "presumptively lawful," but that list contains the obvious—felons and the mentally ill. 554 U.S. at 627, n.26. The court in *Williams* noted the importance of the qualifying adverb "presumptively":

> In fact, the phrase presumptively lawful regulatory measures suggests the possibility that one or more of these longstanding regulations could be unconstitutional in the face of an as-applied challenge.

*Williams*, 616 F.3d at 692 (quotation omitted). Once we leave the margins and examine other bans contained in § 922(g) courts must take a more critical look and ask what is Congress's objective in prohibiting a particular class of person from possessing a gun. That is, courts must ask "why is Congress infringing that person's Second Amendment right?" If the reason for the specific ban isn't an important governmental objective, then the ban can't be constitutional. And if the ban is not substantially related to an important governmental interest that too will keep it from being constitutional. Here, the government cannot point to an important governmental interest for banning illegal aliens from owning firearms, nor can it establish that "its objective is advanced by means substantially related to that [important governmental interest]." *Williams*, 616 F.3d at 692. Thus, because the underlying statute is unconstitutional, this Court must dismiss the indictment against Mr. Meza.

## 4.0 Conclusion

The two questions presented in this case should be answered in a straightforward manner. First, the court must find that when the Constitution uses the term "the people" in the Second Amendment, it does so in the same manner and with the same breadth as the First and Fourth Amendments. Reading the Constitution that way means that the guarantees contained in the Second Amendment extend to those who have a substantial connection to the United States—including illegal aliens. Second, the Court must evaluate § 922(g)(5) under heightened scrutiny. In this case, the government cannot point to an important governmental objective in passing that ban, nor can it establish that prohibiting illegal immigrants from possessing firearms furthers an important governmental interest. As a result, the defendant's motion must be granted and § 922(g)(5) struck down as unconstitutional.

Dated at Milwaukee, Wisconsin, this 6th day of December, 2013.

Respectfully submitted,

/s/     Julie K. Linnen

Joseph A. Bugni
Julie K. Linnen
FEDERAL DEFENDER SERVICES
    OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Ste 182
Milwaukee, WI 53202
Tel. (414) 221-9900
Fax (414) 221-9901
E-mail: joseph_bugni@fd.org
     julie_linnen@fd.org

Federal Defender Services
18        of Wisconsin, Inc.
Case 2:13-cr-00192-RTR   Filed 12/06/13   Page 18 of 18   Document 13