UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff,

          -vs-                    CASE NO.:  13-CR-192

MARIANO A. MEZA,

                    Defendant.

------------------------------------------------------------

          EVIDENTIARY hearing in the above-entitled matter,

held before the Honorable William E. Callahan, Jr., on the 7th

day of January, 2014, commencing at 9:16 a.m. and concluding at

10:19 a.m.


A P P E A R A N C E S

United States Department of Justice
Office of the U.S. Attorney
Ms. Gail J. Hoffman
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin  53202
Appeared on behalf of the Plaintiff.

Federal Defender Services of Wisconsin, Inc.
Ms. Julie Linnen
222 West Washington Avenue
Madison, Wisconsin  53703
Appeared on behalf of the Defendant, also present.

Federal Defender Services of Wisconsin, Inc.
Mr. Joseph A. Bugni
517 East Wisconsin Avenue, Room 182
Milwaukee, Wisconsin  53202
Appeared on behalf of the Defendant, also present.

Ms. Brenda Ferrill, Clerk.
Ms. Sheryl L. Stawski, RPR, Official Reporter.

* * * *

I N D E X

PAGE

WITNESS:  CASSANDRA SHEARING

Direct Examination by Ms. Hoffman                    4
Cross-Examination by Ms. Linnen                      9
Redirect Examination by Ms. Hoffman                 23
Re-Cross Examination by Ms. Linnen                  27


WITNESS:  SPECIAL AGENT RUSSELL DYKEMA

Direct Examination by Ms. Hoffman                   31
Cross-Examination by Ms. Linnen                     37

RtANSCRIPT OF PROCEEDINGS

THE CLERK: 13-CR-192, United States versus Mariano Meza, called for an evidentiary hearing. May I have the appearances, please.

MS. HOFFMAN: Thank you. Good morning. Gail Hoffman appears on behalf of the United States of America; and with me at counsel table is Special Agent Russell Dykema with the Department of Homeland Security.

MS. LINNEN: Good morning, Your Honor. Julie Linnen and Joe Bugni of Federal Defender's Services appearing with Mr. Meza, who's seated to my far left.

THE COURT: Well, good morning to all of you. We're here this morning to conduct an evidentiary hearing in the defendant's motion to suppress statements that was filed back on December 6th. Are the parties prepared to proceed at this time? Ms. Hoffman?

MS. HOFFMAN: Yes, Your Honor.

THE CLERK: Ms. Linnen?

MS. LINNEN: Yes, Your Honor.

THE COURT: How many witnesses are we going to have?

MS. HOFFMAN: Two. And I request that Special Agent Dykema be allowed to remain at counsel table as case agent.

THE COURT: Do you have any objection?

MS. LINNEN: We have no objection, Your Honor.

THE COURT: All right. Call your first witness.

1          MS. HOFFMAN:  Cassandra Shearing.

2          (The witness was first duly sworn under oath.).

3          THE CLERK:  State your full name spelling your last

4     name for the record.

5          THE WITNESS:  Cassandra Shearing, S-H-E-A-R-I-N-G.

6                    D I R E C T   E X A M I N A T I O N

7     BY MS. HOFFMAN:

8     Q    Officer Shearing, how are you employed?

9     A    I work for Immigration and Customs Enforcement.

10    Q    How long have you been so employed?

11    A    Going on seven years.

12    Q    What is your educational background?

13    A    I have a master's degree in criminal justice

14    administration.

15    Q    What training have you received for this position?

16    A    I received federal basic law enforcement training in

17    immigration basic training.

18    Q    What are your responsibilities and duties in connection

19    with your employment?

20    A    To determine removability of aliens in the United States.

21    Q    What percentage of your work is related to immigration

22    enforcement?

23    A    One hundred percent of it.

24    Q    And what do you do in terms of determining a person's

25    alienage?

1    A    Generally, it's -- We conduct an interview of a

2    biographical nature:  Asking questions of where the individual

3    was born; where their parents were born; if there's any active

4    applications in the USCIS system, which would be our

5    counterpart agency who handles applications for immigration;

6    anything that would lead to either determining whether they are

7    here legally or have some status in the United States.

8    Q    Turning your attention to August 27, 2013, did there come a

9    point in time when the name of Mariano A. Meza was brought to

10   your attention?

11   A    Yes, it was.

12   Q    Under what circumstances?

13   A    I received a call from Special Agent Dykema regarding an

14   individual that was just arrested by MPD.  He received a tip

15   from an officer stating that this individual might not be here

16   legally; and he requested that I go check it out, in other

17   words, go interview him at the jail.

18   Q    What was the purpose of that interview?

19   A    To determine whether the individual was here illegally or

20   not.

21   Q    And what, if anything, would you do after making a

22   determination of a person's alienage?

23   A    If, in fact, we have reason to believe that they are here

24   illegally, we would place a detainer on them.  Once they are

25   done with their charges in local custody, they would fall into

1  our custody; we would begin the procedures for removability.

2  Q   Was the purpose of your interview related to deportation

3  proceedings?

4  A   Yes, ma'am.

5  Q   What happened after you interviewed -- Did you advise Mr.

6  Meza of his constitutional rights?

7  A   I did not Mirandize him because it was an administrative

8  procedure.  We are not required to Mirandize prior to our

9  interviewing because I work with an administrative process.

10 Q   And --

11         THE COURT:  Say that again.  You did not Mirandize him

12 or you did?

13         THE WITNESS:  I did not, sir.  The procedures that I

14 generally go through are administrative, not criminal in

15 nature; so, therefore, we're not mandated to Mirandize an

16 individual before we interview them.

17         THE COURT:  Okay.

18 BY MS. HOFFMAN:

19 Q   Did you, in fact, on August 27th of 2013 interview

20 Mr. Meza?

21 A   I did.

22 Q   Do you see him in court today?

23 A   I do.

24 Q   Would you identify him for the record by where he's seated

25 and what he's wearing.

1    A   Yes.  He's the individual to the far right at the back

2    counsel table with the inmate blue clothing.

3    Q   Where did you interview Mr. Meza?

4    A   Milwaukee County Jail.

5    Q   What were you wearing?

6    A   I was wearing -- We don't wear a uniform, so I would have

7    been wearing normal street clothes with my badge and my empty

8    gun holster.

9    Q   And was Mr. Meza brought in to see you?

10    A   Yes.

11    Q   Did you identify yourself?

12    A   At the beginning of every interview that I conduct, I

13    identify myself as Officer Shearing of Immigration; that I have

14    a few questions to ask.

15    Q   After you identified yourself, did he have any questions

16    for you related to the purpose of the interview?

17    A   At that time, no.

18    Q   What questions did you ask him?

19    A   May I open to my notes?

20    Q   Yes.

21    A   I began with asking him what his full and correct name was;

22    date of birth; I asked him if he had a social security number;

23    where he was born; if he went to high school here; and whether

24    he completed his high school; if he was working; what his

25    current address was; if he had children; and if he was married

1    or not.

2           He talked about his father; got his father's full

3    name; and whether his father was still alive or not; his

4    mother; and her biographical information.

5           And then I asked him about his health; and whether he

6    had any gang affiliation; all questions that are standard for

7    our interview process.

8    Q    Are those questions considered by your department to be

9    biographical in natural?

10   A    Yes.

11   Q    Did you at any point question him regarding the reason for

12   his incarceration?

13   A    No.

14   Q    Approximately, how long did the interview last?

15   A    My best guess is it went probably no longer than 20

16   minutes.

17   Q    Did Mr. Meza have any questions of you?

18   A    He asked what it was for.  I, again, repeated that it was

19   for immigration purposes.  He asked what was going to happen,

20   and I told him at that point I didn't know.  He had given me

21   some information that his mother might possibly have some sort

22   of status in the United States, and I needed to research that

23   before I could determine whether or not we were going to put a

24   hold on him and what was going to happen from that point

25   forward.

1    Q    Did there come a point in time when you later learned that

2    Mr. Meza would be prosecuted in federal court?

3    A    Yes.  According to my notes here, on September 20th, S.A.

4    Dykema called me and let me know that he had been accepted for

5    prosecution.

6    Q    Now, I'm handing -- I've handed you what's been marked as

7    Exhibit No. 1.  Is this what you used to refresh your memory?

8    A    Yes, ma'am.

9          MS. HOFFMAN:  Government moves Exhibit 1 into

10    evidence.

11          MS. LINNEN:  No objection, Your Honor.

12          THE COURT:  It's received.

13    BY MS. HOFFMAN:

14    Q    Was the interview recorded?

15    A    No, ma'am.

16    Q    At any time did he ask you to terminate the questioning

17    regarding his biographical information?

18    A    He did not.

19          MS. HOFFMAN:  I have no further questions.

20          THE COURT:  Cross-examination.

21          MS. LINNEN:  Thank you, Your Honor.

22                C R O S S - E X A M I N A T I O N

23    BY MS. LINNEN:

24    Q    Good morning, Agent Shearing.

25    A    Good morning.

1   Q   So you've been an officer with Immigration and Customs

2   Enforcement for about seven years, you said?

3   A   Correct.

4   Q   As part of your role there, you interview individuals to

5   determine their immigration status?

6   A   Correct.

7   Q   And you're charged with enforcing the customs and

8   immigration laws of the U.S.?

9   A   Correct.

10  Q   So you complete interviews at jails and, specifically, the

11  Milwaukee County Jail, correct?

12  A   Correct.

13  Q   How many interviews do you think you've done at the

14  Milwaukee County Jail?

15  A   Over the span of what time?  My career?

16  Q   Your seven years.

17  A   Probably over 1,000.

18  Q   Okay.  So it's probably safe to say that you're familiar

19  with the common practices within the jail facility?

20  A   Correct.

21  Q   Have you ever toured the interior of the jail?

22  A   I actually -- I don't have -- I have an ID, so I go up

23  through interior of the jail to conduct my -- I have contact

24  interviews.  I don't go through the back lobby.

25  Q   I'll get into that more in a moment.  I guess I'm asking,

1    have you ever toured the cells?

2    A    No, I have not, ma'am.

3    Q    Okay.  So I guess it's safe to that say you do know,

4    though, that inmates are allowed to move through the halls

5    unmonitored?

6    A    Correct.

7    Q    And without generally an accompanying correctional officer?

8    A    Correct.

9    Q    Okay.  Are you aware that the third floor is the intake

10   pod?

11   A    Yes.

12   Q    So inmates that are new to the facility would be housed on

13   the third floor of the intake pod, correct?

14   A    Generally, yes.

15   Q    Okay.  So going back to what you touched on earlier, you

16   obviously know that not everybody is just allowed to walk into

17   the Milwaukee County Jail and visit inmates?

18   A    Correct.

19   Q    But under, you know, special rules, you're allowed to

20   because you're a law enforcement officer?

21   A    Uh-huh.

22           THE COURT:  Is that a yes?

23           THE WITNESS:  Yes, sir.

24   BY MS. LINNEN:

25   Q    And you first -- As you're walking in the doors of the

1  Milwaukee County Jail, you first present your badge to the

2  sheriff's deputy seated at the counter right there, correct?

3  A   Correct.

4  Q   Then you are buzzed through a glass door?

5  A   I actually go up to the records section --

6  Q   Okay.

7  A   -- on the first floor, and then enter the jail through --

8  through that section.

9  Q   So do you have to go through a metal detector?

10  A   I do not because of -- I have to show my credentials to go

11  past the --

12  Q   Okay.  I'm assuming you go through a series of locked

13  doors, though?

14  A   Correct, and I have to identify myself with my badge that

15  they've given me.

16  Q   And then you make your way up to the third floor?

17  A   Correct.

18  Q   When you get there, you have to go through -- you have to

19  be buzzed through another locked door, correct?

20  A   When I enter off of the elevators, I immediately go to the

21  CO that's at the desk, let them know that I'm there for a

22  contact interview, then they give me an interview room, and the

23  inmate is actually brought out to me.  That's how that works.

24  Q   Going back to when you said you were speaking to the

25  correctional officer identifying yourself, they call to the pod

1   to have the inmate brought to you, correct?

2   A   Correct.

3   Q   So you identify I would like to see Mariano Meza?

4   A   Uh-huh, yes.

5   Q   And then you were taken to an interview room?

6   A   Correct.

7   Q   The interview room was locked at the time you got to it?

8   A   Yes, ma'am.

9   Q   And so the correctional officer who was accompanying you

10  opened the door for you?

11  A   Correct.

12  Q   And then you sat down in the interview room?

13  A   Correct.

14  Q   Can you tell me, just describe how big the interview room

15  itself is.

16  A   I guess it would be maybe seven by seven.  It's just a

17  small square room.

18  Q   Okay.  So it fits about two chairs and a table?

19  A   Yeah, you can probably fit three around all sides if you

20  wanted.

21  Q   Okay.  So when you're seated in the room --

22  A   Uh-huh.

23  Q   -- I guess --

24       MS. LINNEN:  Your Honor, could I approach and have the

25  agent sketch the layout of the room?

1           THE COURT:  Sure.

2           MS. LINNEN:  Thank you.

3   BY MS. LINNEN:

4   Q   Okay.  So on your sketch could you please detail the

5   location of the door, the table, the chairs.

6   A   Okay.  This would be the door.  The table is generally this

7   way.  On that day it was against the wall.  My chair was here.

8   Mr. Meza's chair was here.  So when he entered, he immediately

9   sat down right there.

10  Q   There's an intercom in the room, too, right?

11  A   I believe there's one on the wall.  I don't know.  I've

12  never used them quite honestly.

13  Q   Okay.

14          THE COURT:  Could I take a look?  Show me where

15  everybody is.

16          THE WITNESS:  This would me.

17          THE COURT:  Number one.

18          THE WITNESS:  Right here.

19          THE COURT:  Why don't you put a number two.  Number

20  two is where Meza is?

21          THE WITNESS:  Yes, sir.  Table.  Door.  And this is, I

22  presume, what the intercom is.  I usually only use it to buzz.

23          THE COURT:  You have a little line at the bottom

24  crossing -- that's the door?

25          THE WITNESS:  That's the door, sir.

1          THE COURT:  Okay.

2     BY MS. LINNEN:

3     Q   So you mentioned just now that you buzzed to get out of the

4     room, correct?

5     A   Correct.  It's locked.  As soon as it closes, it's locked

6     both ways.

7     Q   Okay.  So you're seated in position one?

8     A   Correct.

9     Q   And you're waiting for Mr. Meza to be brought to you --

10    A   Uh-huh.

11    Q   -- to the room, and the correctional officer brings him to

12    the room, correct?

13    A   Correct.

14    Q   And they unlock the door, correct?

15    A   Generally, when there's not an inmate in there, they'll let

16    us put the chair in the door to leave the door open; so they

17    don't have to -- the inmate is not always walked from their pod

18    directly to the room.  Sometimes they're locked through, and

19    then they just tell -- they direct the inmate to the room.

20    Q   But the inmate, when they come from their pod area --

21    A   Correct.

22    Q   -- they have to identify themselves to the correctional

23    officers --

24    A   Yes.

25    Q   -- seated at the desk?  How many correctional officers are

1      seated there?

2      A    Just one for the most part.

3      Q    Do they carry weapons?

4      A    That I do not know.

5      Q    Okay.  So they identify themselves and are sometimes --

6      generally walked to the interview room?

7      A    Depending on the correction officer, yes, and what's going

8      on out there.

9      Q    Okay.  Then placed in the interview room with you?

10     A    Uh-huh.  Correct.

11     Q    So that day Mr. Meza was seated in position two?

12     A    Yes.

13     Q    And then the correctional officer, if he's -- he or she --

14     is there, leaves.  The door locks --

15     A    Correct.

16     Q    -- and you two are seated in the room together?

17     A    Yes, ma'am.

18     Q    And that's when you identified yourself to Mr. Meza?

19     A    Yes.  Yes.

20     Q    And you began your questioning?

21     A    Yes, ma'am.

22     Q    So when you first began your questioning, did you show him

23     your badge?

24     A    I did not.

25     Q    Was it visible?

1    A    It would be on my belt like it is now.

2    Q    So seated it was probably visible?

3    A    I would assume so.

4    Q    Okay.  And then you began questioning him?

5    A    Yes, ma'am.

6    Q    You asked him if -- You asked him about his social security

7    number?

8    A    Correct.

9    Q    If he was born here?

10   A    Correct.

11   Q    His parents' citizenship?

12   A    Yes.

13   Q    You confirmed that he attended elementary, middle and high

14   school here?

15   A    Generally, we just are more concerned with high school and

16   whether they were able to achieve a degree or not.

17   Q    Okay.  But you confirmed that he did attend high school?

18   A    Correct.

19   Q    And he told you he has two children?

20   A    He did.

21   Q    And that they were born in the United States?

22   A    Yes, ma'am.

23   Q    And that they live in Milwaukee?

24   A    Yes, ma'am.

25   Q    And that he sees them frequently?

1    A    I'm not sure if we discussed the frequency of whether he

2    saw his children or not.

3    Q    And all of that, though, is relevant to determining if he's

4    here illegally?

5    A    Yes.  Not only are we determining if he's here illegally,

6    but we're also trying to determine if he's eligible for any

7    applications or status grants.  So it's a two-fold process.

8         I'm not just there to go against him.  I'm also there

9    to determine if he's actually eligible.  And when he indicated

10   that his mother might possibly have citizenship, that's another

11   avenue I have to check out.

12   Q    Okay.  Going back to the content of your questions, one of

13   your questions was how did you get here, correct?

14   A    Correct.

15   Q    So if he came here illegally --

16   A    Uh-huh.

17   Q    -- without inspection, he would be violating 8 USC 1325?

18   It's illegal entry.

19   A    Yes.

20   Q    And your job is to enforce the immigration laws?

21   A    Yes, ma'am.

22   Q    Okay.  Did he tell you if he's had a job here in the past?

23   A    If he's had a job?  I asked him if he currently was

24   working.  He indicated that he was not.  We did not talk about

25   previous.

1    Q   Previous jobs, okay.  So during this interview, did you

2    offer Mr. Meza anything like a cigarette?

3    A   No, ma'am.

4    Q   A meal?

5    A   No.

6    Q   A drink?

7    A   No.

8    Q   Did you offer to let him call anyone?

9    A   No, I did not.

10    Q   Did you offer to let him use the bathroom?

11    A   No, I did not.  However, if he indicated that he needed to,

12    I would have allowed him.

13    Q   Okay.  Did you offer to let him call his attorney?

14    A   I did not.

15    Q   You knew he had been arrested, though --

16    A   Yes, ma'am.

17    Q   -- on charges?  And you knew he had had a preliminary

18    hearing that morning that you conducted --

19    A   That I did not know.

20    Q   After you had gotten all the information you needed from

21    him about his immigration status, you terminated the interview?

22    A   Yes, ma'am.

23    Q   You buzzed to be released from the room, as you mentioned

24    earlier?

25    A   Yes, ma'am.

1  Q   And you were released first from the room?

2  A   I honestly don't recall.  It depends on what the CO has

3  going on at the time; if they're allowed to let him back into

4  the pod or not.  Sometimes they have to remain in the rooms by

5  themselves, and I can go.  Sometimes we leave together.

6  Q   The CO is generally in charge of that?

7          THE COURT:  CO means correctional officer?

8          THE WITNESS:  Yes.

9  BY MS. LINNEN:

10 Q   And the correctional officer had to come and unlock the

11 door --

12 A   Yes.

13 Q   -- for anybody to be released from the room?

14 A   Yes.

15 Q   So then you made your way out of the interview room.  And

16 do you remember exactly what the correctional officer was doing

17 with Mr. Meza at that point?

18 A   I do not.  I usually just exit off the floor and leave.

19 Q   Okay.  But he generally isn't allowed back into his cell or

20 the pod area until you've left the floor?

21 A   It is dependent on what is going on -- in the open area at

22 the time.  If there's no -- nothing going on, generally the

23 guard allows them to walk back to their pod entry and wait to

24 be buzzed in.  That day I do not remember what happened.

25 Q   And you have to be, again, buzzed off the third floor?

1  A   If the door is -- If the sliding door is locked to the
2  elevators, yes, I have to wait.  If it's not, and it's usually
3  a 50/50 call, then I just walk to the elevators and exit.
4  Q   It's actually a series of doors, though, to the elevator.
5  I believe there are three -- two or three?
6  A   If you're on the floor, it's only one.
7  Q   Okay.  Thank you.  So when you got back to your office, you
8  did additional research?
9  A   I did.  I ran his name and date of birth he gave me through
10  all of our system checks.
11  Q   And then subsequently you lodged a detainer against him?
12  A   Yes, ma'am.
13  Q   That same day?
14  A   Yes, ma'am.
15  Q   Okay.  And, eventually, you got back to the special agent
16  with the information you had obtained?
17  A   I did.  I called Russell and let him know that I had
18  conducted the interview, and at that point I believed Mr. Meza
19  to be in the United States illegally, and I was placing a
20  detainer.
21       MS. LINNEN:  Okay.  Could I have the Court's
22  indulgence for one moment, please.
23            THE COURT:  Sure.
24       MS. LINNEN:  Thank you.
25  BY MS. LINNEN:

1    Q    Before you went to interview Mr. Meza, did you read any of

2    the police reports that were prepared regarding his arrest?

3    A    I did not.

4    Q    Did you know about the bullet that had been found in this?

5    A    I did not know about that until later on.

6    Q    Okay.  Before -- As you were questioning him, you mentioned

7    that he -- he asked you a question about clarifying -- a

8    clarifying question?

9    A    Yes, he had asked -- After we had gone through most of the

10   questions, I always follow up by asking if they have any

11   questions of me, about the process, or what's going on.  He did

12   ask, what's this all about or something along those lines.  And

13   I explained to him I was trying to determine if he was here

14   illegally and what status he may or may not have.

15   Q    But that was at the end of the interview that you allowed

16   for questioning like that?

17   A    Correct.

18   Q    Did you write reports to refer to the prosecution?

19   A    Did I write reports?

20   Q    Did you write a report that was subsequently given to AUSA

21   Hoffman?

22   A    The only thing I provided AUSA Hoffman was my interview

23   notes, and I wrote up a memo for -- of investigation on

24   September 20th that I also provided to Russell later on.  I'm

25   not sure if the AUSA has received --

1          THE COURT:  Provided to whom?  Russell?

2          THE WITNESS:  I'm sorry, S.A. Dykema.

3    BY MS. LINNEN:

4    Q   And that you prepared that typewritten report from your

5    notes --

6    A   Correct.

7    Q   -- on the same day that he informed you -- the special

8    agent informed you that it would be a case that would be

9    prosecuted?

10   A   Correct.

11   Q   Okay.  Do you have any additional reports at all that you

12   prepared?

13   A   I do not.

14         MS. LINNEN:  Okay.  I don't believe we have any more

15   questions.

16         THE COURT:  Any redirect, Ms. Hoffman?

17         MS. HOFFMAN:  Yes, Your Honor.

18              R E D I R E C T   E X A M I N A T I O N

19   BY MS. HOFFMAN:

20   Q   To be clear, Officer Shearing, were you alone in the room

21   with Mr. Meza?

22   A   Yes, I was.

23   Q   And was he handcuffed?

24   A   No, ma'am.

25   Q   How long did the interview take?

1  A   My best guess is about 20 minutes.

2  Q   And counsel had asked you questions about Title 8 United

3  States Code, Section 1325.  Does your office have a policy

4  regarding prosecution for entry without inspection?

5  A   Yes.  We generally will go after individuals that -- or

6  start the proceedings for individuals that are here illegally

7  under different acts of immigration law.  It depends on how

8  they entered and a whole slew of different things.

9  Q   But, in other words, for entry without inspection, is it

10  true that the policy is not to prosecute that offense or

11  present it for prosecution?

12  A   Correct.  Yes.

13  Q   And of these immigration interviews that you've conducted

14  and -- Approximately, how many have you conducted during the

15  course of your career?

16  A   Definitely over 1,000.

17  Q   How many have resulted in -- have been presented for

18  prosecution, criminal prosecution?

19  A   Zero.

20       THE COURT:  I don't understand.  You've conducted

21  about 1,000?

22       THE WITNESS:  For criminal prosecution?

23       THE COURT:  No, no.  Let me.  You've conducted more

24  than 1,000 interviews?

25       THE WITNESS:  Yes, sir.

1          THE COURT:  And is the question, of those thousand

2    interviews how many were referred to the justice department for

3    criminal prosecution?

4          MS. HOFFMAN:  Yes.

5          THE WITNESS:  Well, then I guess I would have to

6    rephrase.  Referred by me?

7    BY MS. HOFFMAN:

8    Q    Correct.

9    A    We occasionally prosecute for re-entry, but that would be a

10   different set of interview -- we Mirandize at the beginning of

11   that interview.  It's different than just entry without

12   inspection; it's a different process.

13   Q    So of this type of interview --

14   A    This type of interview, none have been pushed forward, to

15   my knowledge, for --

16   Q    You're only speaking about your interviews?

17   A    Correct.  Yes.

18          MS. HOFFMAN:  I have no further questions.

19          MS. LINNEN:  Going back.  Could I have, again with the

20   Court's indulgence -- I'm sorry for -- just a moment.

21          THE COURT:  Before you do that, may I ask a few

22   clarifying questions?

23          MS. LINNEN:  Yes.

24          THE COURT:  Just so I understand --

25          THE WITNESS:  Yes, sir.

1       THE COURT:  -- you say you've conducted more than

2  1,000 interviews?

3       THE WITNESS:  Yes, sir.

4       THE COURT:  And among those thousand interviews, had

5  there been occasions when you discover during the interviews

6  that there was a re-entry after deportation?

7       THE WITNESS:  Yes, that has occurred; and then the

8  interview stops, and we proceed on a -- down the criminal path

9  which is different than the administrative.

10      THE COURT:  So do I understand you to be saying that

11  in this case, Mr. Meza's case, when you went in, did you have

12  any information that he was or was not in this country legally

13  at the time you started your interview?

14      THE WITNESS:  I had received a tip from S.A. Dykema

15  saying that the MPD believed he might not be here legally, but

16  that was the only basis that we had to go on.

17      THE COURT:  Did you have any information at that time

18  which would lead you to suspect that he re-entered after

19  deportation?

20      THE WITNESS:  No, sir.

21      THE COURT:  And do I understand you to be saying that

22  if you have information before you begin an interview that

23  suggests to you that somebody may very well have re-entered

24  after deportation, then you Mirandize them?

25      THE WITNESS:  Correct.  Before I go over to the jail,

1    I get a list, and I make sure -- I run through at least the

2    name and the date of birth through our system to ensure that --

3    to try to lessen that possibility that we are blindly

4    interviewing a re-entry without Mirandizing first.  There's no

5    foolproof way of doing that.

6            THE COURT:  Did you do that -- follow that procedure

7    with respect to --

8            THE WITNESS:  Yes, I did.

9            THE COURT:  -- before going to --

10           THE WITNESS:  Yes, I did.

11           THE COURT:  -- seeing Mr. Meza?  What did your --

12   What did your initial checking into his records or whatever

13   reveal to you?

14           THE WITNESS:  I got all negative receipts back from

15   all of the systems indicating that he had never come into

16   contact with Immigration.

17           THE COURT:  Okay.

18           THE WITNESS:  And that he had no active applications

19   in our systems.

20           THE COURT:  Okay.  You may proceed.

21           MS. LINNEN:  Thank you, Your Honor.

22               R E C R O S S - E X A M I N A T I O N

23   BY MS. LINNEN:

24   Q   So your systems don't document criminal offenses or current

25   criminal charges?

1  A    The immigration systems are tied to criminality in that we

2  can run a criminal history on someone, yes; but it doesn't

3  indicate whether -- I guess you're going to need to clarify.  I

4  mean, I can run a criminal history on someone, yes; however,

5  the systems that we run are encounters with Immigration,

6  whether they have already an immigration file started for

7  whatever purpose whether it be an application, a previous

8  encounter either on the border or interior, visas, entries and

9  departures, students with our service system.

10          I mean, it crosses the board into any -- legal entry,

11  it would cover that.  If he -- Going into the interview, he

12  could have either been a U.S. citizen or non-U.S. citizen.

13  Just because my checks were negative doesn't indicate, yes,

14  he's definitely illegal.  It just indicates that he has no

15  prior occurrences with our systems.

16  Q    Okay.  So with regard to the immigration laws of the United

17  States and your office's policies --

18  A    Uh-huh.

19  Q    -- you may have a policy, but that doesn't mean that a

20  prosecution couldn't happen --

21  A    Correct.

22  Q    -- under those statutes?  Okay.  Is that a written policy

23  or just a --

24  A    For entry without inspection?

25  Q    Right.  So the offenses that your office decides deserve

1    prosecution and don't, do you have a written policy on it?

2    A    I believe there's probably a memorandum on what we can do.

3    It changes every so often.

4    Q    But you've never seen a written memorandum?

5    A    There's a memo out there as to what we're supposed to

6    pursue, yes.

7    Q    Okay.  But, ultimately, it's not your decision as to what

8    gets referred, correct?

9    A    Referred to?

10   Q    Prosecution.

11   A    If I suspect that there's substance enough for criminal

12   prosecution, yes, I can refer that myself.  That can be my

13   decision.

14   Q    Okay.  So when you're interviewing somebody about their

15   immigration status, you ask them where they were born?

16   A    Yes.

17   Q    You ask them how they came to the United States?

18   A    Yes.

19   Q    You ask them whether they were inspected when they came

20   here?

21   A    Yes.

22   Q    You ask them whether they've ever been deported?

23   A    We do ask that question, yes.

24   Q    Those are all part of your administrative --

25   A    Yes, ma'am.

1    Q    -- interview process?  And those are the same elements --

2    those elements that I just listed in the last question, are the

3    same for 1325 and 1326, correct?  Those are the same factors?

4    A    They're the same basic information that we ask of all the

5    aliens that we encounter.  If that's what you're asking, then,

6    yes.

7    Q    Okay.  And, again, just to clarify because of your -- you

8    have knowledge of the immigration laws, being here illegally is

9    a crime?

10   A    Yes, ma'am.

11   Q    Okay.  The first time?

12   A    Yes, ma'am.

13   Q    Okay.  Thank you.  Well, I guess -- You can go to jail for

14   it?

15   A    Yes, ma'am.

16           MS. HOFFMAN:  Objection; beyond the scope of this

17   witness's knowledge whether someone could be incarcerated or

18   not for conviction of a particular offense.  It depends on a

19   variety of factors.

20           THE COURT:  The question is could you.  Any crime --

21   In any crime you face jail, don't you?

22           MS. HOFFMAN:  Correct.

23   BY MS. LINNEN:

24   Q    And it is a crime?

25   A    Yes, ma'am.

1    MS. LINNEN:  I would, Your Honor, ask to move the

2    exhibit that we asked the agent to create.

3    THE COURT:  Sure.  Why don't we put a sticker on that.

4    That will be -- Let's make that No. 2.

5    MS. LINNEN:  We have it actually labeled as 1001.

6    THE COURT:  Okay, 1001.  That's a good number.  Any

7    objection to the drawing being received?

8    MS. HOFFMAN:  No, Your Honor.

9    THE COURT:  It's received.  Any further questions from

10   either counsel?

11   MS. LINNEN:  I don't believe so.  Thank you.

12   THE COURT:  Any redirect?

13   MS. HOFFMAN:  No.  Thank you.

14   THE COURT:  You may step down.  Thank you, ma'am.

15   Call your next witness, please.

16   MS. HOFFMAN:  Special Agent Dykema.

17   (The witness was first duly sworn under oath.)

18   THE CLERK:  State your full name spelling your last

19   name for the record.

20   THE WITNESS:  Russell Andrew Dykema, D-Y-K-E-M, as in

21   Mary, A.

22          D I R E C T   E X A M I N A T I O N

23   BY MS. HOFFMAN:

24   Q    How are you employed?

25   A    I'm a special agent with the United States Department of

Homeland Security Immigration and Customs Enforcement Homeland

Security Investigations.

Q   That's a mouthful.

A   To say the least.

Q   How long have you been so employed?

A   Eight years.

Q   What's your educational background?

A   I have a bachelor's degree in criminal justice with a law

enforcement emphasis.

Q   What training have you received for this position?

A   Our training is a six-month training in Georgia, the

federal law enforcement training center, over basic criminal

law and then specifically immigration and customs law.

Q   What are your responsibilities and duties in connection

with your current assignment?

A   To conduct criminal and administrative investigations into

immigration and customs laws, rules and regulations to include

illegal alien in possession of ammunition.

Q   Turning your attention to a time frame around August 25th,

2013, did you receive information from a City of Milwaukee

police officer regarding Mariano Meza?

A   Yes, I did.

Q   What information did you receive?

A   That Mr. Meza had been arrested previous -- or the night

before for a crime; that they believed that he was in the

1    country illegally and wanted to make sure that someone looked
2    into his status so that he didn't slip through the cracks as in
3    get out of jail without being interviewed by Immigration.
4    Q   And when this officer contacted you, was Mr. Meza in state
5    custody?
6    A   He was in custody at that time, yes.
7    Q   Was the purpose of the contact in order to see whether he
8    was eligible for deportation?
9    A   Correct.  It was just to determine if he was legally
10   present in the U.S.
11   Q   After receiving that contact, what, if anything, did you
12   do?
13   A   I contacted Deportation Officer Shearing, as she handles
14   the Milwaukee County Jail, and that's where Mr. Meza was, and
15   referred his name and date of birth to her, and just asked her
16   if she can keep an eye out for Mr. Meza showing up on her jail
17   list, and to interview him when he did show up.
18   Q   And when you said "interview him," what did you mean by
19   that?
20   A   To interview him administratively to see if he was legally
21   or illegally present in the United States and to take action
22   appropriate at that time depending on what her interview
23   determined.
24   Q   Did you anticipate that Ms. Shearing's --
25   Officer Shearing's interview would be part of any criminal

1    prosecution?

2    A    I did not at that time, no.

3    Q    Did there come a point in time, approximately one month

4    later, when this matter was referred for criminal prosecution?

5    A    Yes.

6    Q    And when you sent Officer Shearing over to interview

7    Mr. Meza, did you anticipate that that interview would be part

8    of any criminal case?

9    A    Absolutely not.

10   Q    Subsequently, did you receive -- As a result of Mr. Meza's

11   arrest by the City of Milwaukee, did you receive biographical

12   information about Mr. Meza?

13   A    I did.

14   Q    What information did you receive?

15   A    I received reports, booking records, any contacts that he

16   had had with the Milwaukee Police Department over the span of

17   the last ten years or so.

18   Q    And what, if anything, did you do with that information?

19   A    I reviewed, specifically, the information that was given to

20   me about his previous arrest -- his previous arrests; and

21   determined that -- it appeared Mr. Meza was here illegally, and

22   that based on his crimes, that he was somebody that should be a

23   candidate for federal prosecution.

24   Q    When you reviewed his prior arrest information, did you

25   determine from reviewing those documents that he had listed

1    different places of birth?

2    A    Yes.  Mr. Meza had listed that he was born in Mexico on two

3    different occasions; that he was born in California on a

4    different occasion; that he was born in Milwaukee on different

5    occasions.

6    Q    And also based upon the information provided during the

7    course of his arrest, did you find the social security number

8    that the defendant had provided?

9    A    There was a social security number that was attached to one

10   of his records.  I don't recall if it was -- what it was

11   attached to; but that social security number, I checked with

12   the Social Security Administration, and it did not come back to

13   Mr. Meza.

14   Q    And was this separate and apart from Officer Shearing's

15   interview of the defendant?

16   A    Yes.  Everything I did was separate from her initial

17   interview over the next month.

18   Q    Okay.  Did you also determine, based upon biographical

19   information provided by the defendant, the name of his mother?

20   A    Yes.

21   Q    What, if anything, did you do after determining who the

22   defendant's mother was?

23   A    I was able to identify an alien registration file for his

24   mother, and I ordered that alien registration file and reviewed

25   it for biographical information regarding Mr. Meza.

Q   What, if any, information did you find?

A   On a number of applications his mother indicated that
Mr. Meza was born in Mexico.

Q   And was that application signed by the defendant's mother
under the penalty of perjury?

A   Yes, it was.

Q   Did you also conduct an investigation into other relatives
of Mr. Meza located in the city of Milwaukee?

A   Yes.

Q   Did you locate the defendant's sister-in-law?

A   I did.

Q   And what is her name?

A   Her first name is Shannon.  I do not recall if her last
name is Meza.  She's married to Mr. Meza's brother.

Q   After locating her, what, if anything, did you do?

A   I was actually trying to locate his mother at the time and
ended up running into his sister-in-law, and I interviewed her
and questioned her in regards to her knowledge of where
Mr. Meza was born.

Q   What did she say in that regard?

A   She indicated that he was born in Leon Guanajuato.  We
abbreviate it as GTO, if that helps.

Q   What, if anything, did you do after determining that?

A   I did not attempt to ascertain where he was born via his
mother's A-file or interview the sister-in-law until after I

1    was notified that there was a -- there was an issue with

2    Deportation Officer Shearing's statement being inadmissible.

3    So that information was just developed as a backup to what

4    happens if Officer Shearing's statement is not admitted.

5        MS. HOFFMAN:  I have no further questions for the

6    witness.

7        THE COURT:  Cross.

8        C R O S S - E X A M I N A T I O N

9    BY MS. LINNEN:

10   Q   Just very briefly.  What information -- You were referring

11   to information you gathered at some point.  Is that a packet of

12   information?  Where did you get that information?

13   A   We got information from a lot of different places.  So I

14   ran database checks.  I also received reports and videos and

15   audio recordings from the Milwaukee Police Department regarding

16   arrest reports, and video and audio of interviews.

17       I conducted interviews myself.  I obtained immigration

18   alien files.  There's a lot of information that -- If you want

19   to be more specific, I'd be happy to tell you how I got it.

20   Q   I don't think you need to be more specific.  You said --

21   When did you say you got that?

22   A   Which piece of information?  Which piece?

23   Q   The database checking.

24   A   After Officer Shearing interviewed Mr. Meza and it was

25   determined that he was illegally present, I contacted the MPD

1  officer that had alerted me and advised him that a detainer had

2  been lodged.  They advised me that this person --

3  Q    Can I stop you for a second?

4  A    Sure.

5  Q    When was that, the same day as the detainer?

6  A    It would have been that same day -- I'm not sure when

7  Officer Shearing contacted me and said that a detainer had been

8  filed.  So it could have been that day or the next, but it was

9  within a few days.

10       And the MPD officer advised me that I might want to

11  take a look at this individual.  So I said send me all the

12  reports and things that you have and I'll take a look at it.

13       So over the next week or two, I don't know when I got

14  the reports, but I reviewed the reports and the video.  Some of

15  it was pretty lengthy.  So not until I reviewed all these

16  things until sometime in September did I contact the U.S.

17  Attorney's Office.

18  Q    Okay.  And all of the information gathering you performed

19  and all of the information gathering the other agent performed

20  were based on the MPD -- the call from the MPD officer?

21  A    Yes.

22  Q    And he told you during that call that -- why Mr. Meza had

23  been arrested?

24  A    I don't remember specifically if it was the exact thing

25  that Mr. Meza had been arrested for.  I specifically remember

1    them saying they want us to look at him as Mr. Meza had made

2    threats to one of the officers.   So they didn't get into

3    specifics as to exactly what he was arrested for and exactly

4    what the threats were.

5    Q   Did he tell you that Mr. Meza had been interviewed by an

6    MPD officer at the jail two days prior?

7    A   I don't -- No, they never told me that Mr. Meza had been

8    interviewed.   At that time it wouldn't have made a difference

9    to me.   They were just asking me to look into the immigration.

10   Q   Okay.   So at no point before you contacted your colleague

11   to perform the interview did you conduct other research based

12   on the tip from the MPD officer?

13   A   No.

14   Q   Okay.   And what did you review prior to your testimony

15   today?

16   A   I've reviewed Milwaukee Police Department reports, I

17   reviewed video and audio recordings, I reviewed Mr. Meza's

18   mother's A-file, and I've gone over different databases that we

19   search on a regular basis.

20   Q   What about notes?

21   A   Notes of --

22   Q   Your notes.

23   A   I reviewed Ms. Shearing's notes.   I do have notes that I

24   took when I talked to his sister-in-law, Shannon.

25   Q   And you reviewed those in preparation for today?

1    A   I don't think I reviewed them in preparation for today;

2    but, I mean, when I wrote them, I looked at them; but I don't

3    think I've read them over for today, no, ma'am.

4          MS. LINNEN:  Okay.  We'd like to move for those notes

5    and other documents, Your Honor.  It's material.

6          MS. HOFFMAN:  First of all, he said he did not review

7    the sister-in-law's notes for today's proceeding.  The reports

8    have all been provided in discovery.  The videos have been

9    provided in discovery.  So I'm not sure what hasn't been

10   provided that he has reviewed, which I would ask the witness to

11   identify, but --

12         THE COURT:  Okay.  I'm not sure he knows what you

13   provided.

14         MS. HOFFMAN:  I provided everything that he's provided

15   to me.  If he's provided it to me, I've provided it to the

16   attorneys.

17          THE COURT:  Okay.

18          MS. LINNEN:  I suppose that's sufficient for now.

19          THE COURT:  I'm sorry?

20          MS. LINNEN:  I suppose that's sufficient for now as

21   long as the agent is testifying that he does not have any

22   materials that he prepared that have -- that he provided to

23   AUSA Hoffman.

24         THE COURT:  I think we're talking about the notes of

25   interview of his mother.

1          MS. LINNEN:  Right.

2          THE COURT:  Those have not been provided to you?

3          MS. HOFFMAN:  Correct, they have not been provided to

4     me; and he testified he did not review them for today.

5          THE COURT:  No, I understand that.

6          THE WITNESS:  And they're right there.  It's just like

7     three lines.  I'd be happy to give everybody a copy before I

8     leave today.

9          MS. HOFFMAN:  That's fine.

10         THE COURT:  Let's give it to the other side.  So now

11    everything has been given to the defense counsel, right?

12         THE WITNESS:  They only have two of the applications

13    from the mother's alien registration file that were pertinent

14    to Mr. Meza's case.  All the other information in there does

15    not pertain to Mr. Meza; but if they would like a copy of the

16    entire A-file, I can make that available, as well.

17         MS. LINNEN:  I think we would, Your Honor, please.

18         THE COURT:  You mean the mother's A-file?

19         THE WITNESS:  Correct.

20         MS. HOFFMAN:  I don't have it.

21         THE COURT:  Let's give them the notes of the interview

22    with the mother, but I don't see any need to turn over the

23    entire A-file of the mother.  Just one moment.  I don't see the

24    relevance of that --

25         MS. LINNEN:  That's fine, Your Honor.

1           THE COURT:  -- at this time.

2           MS. LINNEN:  Could we just also request, if it hasn't

3   yet been provided, the times Mr. Meza listed different birth

4   places or birth dates as you mentioned during your testimony.

5           MS. HOFFMAN:  I've provided that today.

6           MS. LINNEN:  Okay.

7           THE COURT:  Okay.  Where are we?  Are you questioning,

8   or are they questioning?

9           MS. HOFFMAN:  They are.

10          MS. LINNEN:  We have nothing else, Your Honor.

11          THE COURT:  Where are the notes from the interview?

12  We're going to give --

13          MS. HOFFMAN:  I don't have them.

14          THE WITNESS:  I can get them.

15          THE COURT:  Do you have them with you?

16          THE WITNESS:  They're in my bag there.

17          THE COURT:  Why don't you get them so we can complete

18  the circle.

19          THE WITNESS:  Am I coming back?

20          THE COURT:  Why don't you come on back.  Just one page

21  of that, Mr. Dykema?

22          THE WITNESS:  Yes.

23          THE COURT:  Why don't we just make a copy.  If you

24  could make a copy of it, please.

25          MS. LINNEN:  I'm sorry, while the agent is still on

1    the stand, can I ask one additional follow-up question?

2            THE COURT:  Could you wait for my clerk to come back?

3            MS. LINNEN:  Absolutely.  I'm sorry.

4            THE COURT:  Let the record reflect that Brenda, my

5    clerk, has made copies of what I understand to be the notes of

6    your interview of Mr. Meza's mother; is that correct?

7            THE WITNESS:  Sister-in-law.

8            THE COURT:  Sister-in-law, I'm sorry.  And each

9    counsel now has a copy of that; is that correct?  Do you want

10   to mark this or do you want to --

11           MS. HOFFMAN:  Do you know what, why don't we -- why

12   don't we mark that just for the record and --

13           THE COURT:  Okay.

14           MS. HOFFMAN:  -- also it relates to his testimony.

15           THE COURT:  All right.  What do you want to mark it

16   as?

17           MS. HOFFMAN:  Let's mark it two since Government's --

18   my other exhibit was one.

19           THE COURT:  Is that okay with you, Ms. Linnen?

20           MS. LINNEN:  That's fine.

21           THE COURT:  It's now number two, okay.  So it's

22   received.

23           MS. LINNEN:  Could I ask --

24           MS. HOFFMAN:  If it's e-filed, I would redact the

25   personal information contained on this document.

1        THE CLERK:  It will not be.

2        THE COURT:  Okay.  You're questioning, Ms. Linnen.

3        MS. LINNEN:  Thank you.

4   BY MS. LINNEN:

5   Q   Just with regard to the database results that you looked

6   at -- You looked at just the results, correct?  You didn't look

7   at the underlying documents?

8   A   I'm not sure if I'm following.

9   Q   Regarding the addresses that were previously provided for

10  his location of birth, the packet of information that you

11  looked at when you were conducting your investigation in the

12  month after --

13  A   Okay.

14  Q   It's -- It's a packet of information that are database

15  results, correct?

16       THE COURT:  I'm confused.  Let's step back.

17       MS. LINNEN:  I'm sorry.

18       THE COURT:  Why don't we build a little foundation.  I

19  think I know where you want to go, but I'm not sure that we've

20  gotten there yet.  You looked at some database information

21  after the interview by Ms. Shearing, correct?

22       THE WITNESS:  Correct.  Any database checks that I did

23  in our system I would have run the check; and with Mr. Meza in

24  our systems, everything was coming back negative.  So there was

25  no physical hard copy of a record for Mr. Meza.

1        Any of the other records that I looked at from the

2   Milwaukee Police Department, their reports, copies of the

3   booking records, those are all things that I made available to

4   prosecution and to the defense.

5   BY MS. LINNEN:

6   Q   Right.  And those records were original records?

7   A   I believe --

8        MS. HOFFMAN:  Objection as to form of the question.

9   What is "original records"?

10       THE COURT:  Why don't you clarify what you mean.

11  BY MS. LINNEN:

12  Q   What I'm concerned with is when you said that Mr. Meza

13  provided false addresses for his location of birth.

14  A   Okay.

15  Q   Okay.  So where were those addresses or locations provided?

16  A   My understanding of the Milwaukee Police Department booking

17  system is when they arrest someone and they're going through

18  biographical information, one of the questions that they ask

19  would be, where were you born.

20       So the records that I obtained from the Milwaukee

21  Police Department was a print-off from their booking system

22  indicating every time Mr. Meza had been booked into custody and

23  the following booking sheet with the biographical information.

24       So the records that I provided to you is the print-off

25  from the Milwaukee Police Department's record system indicating

1    booking events, the dates that those happened, and the places

2    of birth that were indicated by whichever officer had conducted

3    the booking on that sheet.

4    Q    That was my question.  Thank you.  And you did not actually

5    hear Mr. Meza provide those --

6    A    I have never --

7    Q    -- places of birth?

8            THE COURT:  Let her finish the question.

9    BY MS. LINNEN:

10   Q    -- places of birth.

11           MS. LINNEN:  Thank you, Your Honor.

12           THE WITNESS:  I have never spoken to Mr. Meza in my

13   life.

14           MS. LINNEN:  Okay.  Thank you.  That's all I needed.

15           THE COURT:  Are you finished?

16           MS. LINNEN:  Yes, I am.

17           THE COURT:  Any redirect?

18           MS. HOFFMAN:  No redirect.

19           THE COURT:  Thank you.  You may step down.  Does the

20   Government have any further witnesses?

21           MS. HOFFMAN:  I do not.

22           THE COURT:  Does the defense have any witnesses?

23           MS. LINNEN:  No, Your Honor.

24           THE COURT:  Let me speak with counsel here real

25   briefly at sidebar, please.

1          (A sidebar was held off the record.)

2          THE COURT:  Today is January 7th.  We've come up with

3     a plan to brief the motion to suppress on which we've had this

4     evidentiary hearing, as well as file response briefs and reply

5     briefs to the two motions to dismiss that were filed by the

6     defendant.

7          And what we'll do is this:  On or about February 3rd,

8     each side will file briefs in support of their respective

9     position on the motion to suppress predicated on the

10    information presented here in this hearing.

11         Also, on or before February 3rd, the Government will

12    file its responses to the two motions to dismiss that were

13    previously filed by the defendant.

14         Then on or before February 10th, each side will

15    respond to the briefs filed with respect to the motion to

16    suppress; and the defendant will file on or before February

17    10th any replies he wishes to file in support of the two

18    motions to dismiss.

19         So briefing on all issues presented by the defendant's

20    motions will be completed on or about February 10th.  Is that

21    how everybody else understands it?

22         MS. HOFFMAN:  Yes.

23         MS. LINNEN:  Yes, Your Honor.

24         THE COURT:  Okay.  We have a plan.  Nice to see you.

25         MR. BUGNI:  One final thing.  If we could just have a

1   minute order that Mr. Meza be returned to the Milwaukee County

2   Jail.

3           MS. HOFFMAN:  Well, I think that's pretty much up to

4   the Marshal's discretion in terms of what --

5           THE COURT:  Yeah.  Why?

6           MR. BUGNI:  He's on a writ over here, and he'd like to

7   go back to the Milwaukee County Jail.

8           THE COURT:  Oh, yeah, he should go back to the

9   Milwaukee County Jail.  Right, Marshal?

10          THE MARSHAL:  We'll look into it, Your Honor.

11  Generally, that's what happens.

12          THE COURT:  Yeah, they keep him close.

13          (Discussion held off the record.)

14          (Proceedings concluded at 10:19 a.m.)

15

16

17

18

19

20

21

22

23

24

25

STATE OF WISCONSIN  )
                    )  SS:
MILWAUKEE COUNTY    )




            I, SHERYL L. STAWSKI, a Registered Professional Reporter and Official Court Reporter, for the United States District Court, Eastern District of Wisconsin, do hereby certify that the above proceedings were reported by me on the 7th day of January, 2013, and reduced to writing under my personal direction and is a true, correct and complete transcription of my computer-aided transcription of my stenographic notes.


            Dated at Milwaukee, Wisconsin, this 17th day of January, 2014.


            s/ Sheryl L. Stawski

            Sheryl L. Stawski
            Official Court Reporter
            United States District Court