UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.                                               Case No. 13CR192

MARIANO A. MEZA,

    Defendant.

## BRIEF IN SUPPORT OF MOTION TO SUPPRESS

The defense previously moved to suppress statements made by Mariano Meza. After the filing of that motion an evidentiary hearing was held and testimony taken. Two law enforcement officers testified: Agent Cassandra Shearing, who interviewed Mr. Meza on August 27, 2013 at the Milwaukee County Jail, and Special Agent Russell Dykema, who requested that Agent Shearing conduct the interview and who later conducted additional investigation based on the information obtained during that interview. In support of its original position that Meza's statement should be suppressed the defense submits this memorandum of law.

**1.0 Questions Presented**

Agent Shearing questioned Mr. Meza without advising him of his *Miranda* rights. Tr. at 6. That's not in dispute. In resolving the defense's motion to suppress, this Court is confronted with two issues:

> **Custody:** An individual is in custody if under the circumstances a reasonable person would have felt he was not at liberty to terminate the interview and leave. Here, jail staff escorted Meza from his cell to a seven-by-seven interview room where Shearing was waiting, the door was locked, Shearing never told him that he was free to terminate the interview, and he didn't have the opportunity to ask questions until the interview was over. Under the circumstances was Meza's freedom of movement restrained to the degree associated with a formal arrest?
>
> **Interrogation:** Interrogation refers to express questioning that a law enforcement officer should know is reasonably likely to elicit an incriminating response. As an ICE agent, Shearing enforces statutes criminalizing illegal immigration. She suspected that Meza was in the United States illegally and her questions of him laid the foundation for immigration-related criminal charges. Did Shearing's questions constitute an interrogation?

**2.0    The Circumstances of the Interview**

On August 27, 2013, Special Agent Dykema informed Agent Shearing that Mariano Meza had been arrested and was being held at the Milwaukee County Jail. Tr. at 5. S.A. Dykema requested that she interview Meza at the jail "to determine if [he] was here illegally or not." *Id.* Going into the interview, Shearing suspected, based on a tip from local law enforcement relayed to her by Dykema, that Meza was here illegally. Tr. at 26. The purpose of the interview was to confirm the suspicion.

Shearing interviewed Meza on the third floor of the jail. Tr. at 12. The general public is not allowed access to this area, but an exception is made for members of law enforcement. Tr. 10-12. Of course, as a jail, the Milwaukee County Jail stands as a place that is difficult to get in and, more importantly, out of—most people in jail would prefer not to be there, so the architects design them with plenty of heavy doors and locks. Even law enforcement officers like Shearing must comply with security measures to get inside: she had to present her credentials at least twice, go through several locked doors, and check-in with the on-duty correctional officer, before being escorted to a locked interview room. Tr. at 11-12.

Once Shearing approached the CO's desk and told her she was there to see Meza, the on-duty CO contacted personnel within Meza's pod to summon him and escort him to the interview room. When Meza was removed from his cell, there is no indication that Meza was told who he'd be meeting with or the purpose of the interview. Tr. at 12. When he arrived at the room, Shearing was seated in a chair facing the door. Tr. at 14. Meza sat directly across the table from her, adjacent to the door. The room itself was small and cramped—approximately, seven-by-seven feet, spacious enough for a small table and two or three chairs but not more. Tr. at 13. The agent's sketch of the room at the evidentiary hearing showed a door, table, chairs, and intercom. Tr. at 14-15. There is no evidence that the room, which was inaccessible to the general public and apart from the housing pod, had a window

3
FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
Case 2:13-cr-00192-RTR   Filed 02/03/14   Page 3 of 14   Document 24

or any other amenities. *Id.* at 11–12, 14–15. This is consistent with its location in the interior of the jail facility *Id.*

Once the door to the interview room closed, it automatically locked behind the exiting CO. Tr. at 16. With the door locked behind him, Meza sat down; Shearing then identified herself as an agent with Immigrations and Customs Enforcement and began questioning Meza. Tr. at 17 (describing interaction, including fact that her badge was visible). There's no evidence that she ever gave Meza the option of refusing or terminating the interview. And the agent didn't give any indication that she characterized Meza's participation as elective. With the exception of the first two questions establishing his name and address, all of Shearing's questions to Meza related to his immigration status and family. As Agent Shearing acknowledged, her questions of Meza laid the foundation for criminal charges. Tr. at 29-30.

It wasn't until the end of the twenty minute interview that Meza was allowed to ask "questions of [her], about the process, or what's going on." Tr. at 22. Shearing recalled that it wasn't until the end that Meza was given the opportunity to ask about the purpose of the interview. In response, Shearing explained that she "was trying to determine if he was here illegally and what status he may or may not have." *Id.* Once she'd finished determining Meza's immigration status, Shearing buzzed a CO to unlock the interview room; she then exited the room and left the

jail. Tr. at 19–20. At no time during the interview did Shearing offer Meza food or water, or allow him to place a call to his attorney or family members. Tr. at 19. And there's no indication that she told Meza how long she anticipated the interview would last.

### 3.0 Meza's statements must be suppressed because he was subjected to custodial interrogation without being advised of his *Miranda* rights.

Under these facts, the question is whether Shearing's questioning constituted custodial interrogation triggering *Miranda*'s safeguards. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Given the coercive nature of custodial interactions, an individual must be warned before questioning begins that he has "the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires." *Id.* at 478–79. If the warnings aren't provided, or if the government fails to demonstrate waiver, the evidence "obtained as a result of the interrogation" cannot be used against a defendant at trial. *Id.*

Here, the interviewing agent admitted that she questioned Meza without providing *Miranda* warnings. Suppression of Meza's unwarned statements turns on

whether they were made while he was: (1) in custody; and (2) subject to interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984).

**3.1 Meza was in custody when interviewed by Shearing.**

On the issue of custody, Meza was in jail when the interview took place. This is but one feature of an interrogation relevant to the custody determination. *Howes v. Fields*, 132 S. Ct. 1181, 1191 (2012) ("When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation."). Courts evaluate a person's custody status using the reasonable-person standard: considering the circumstances surrounding the investigation, would a reasonable person would have felt free to put a stop to the interrogation the interrogation and leave? *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004).

Simply put, custody "is a state of mind." *United States v. Slaight*, 620 F.3d 816, 819 (7th Cir. 2010). It is an objective inquiry into how a reasonable person would have understood the situation. *Id.* Neither the intentions, opinions, or perceptions of the interviewing officer, nor the subjective perception of the individual being questioned are considered. *Id.* at 820; *see also Beckwith v. United States*, 425 U.S. 341, 346-347 (1976). Nor does the reason behind the custody control. *United States v. Stewart*, 536 F.3d 714, 720 (7th Cir. 2008).

When making the determination of whether a person is in "custody" the Seventh Circuit provided the following list of factors for Courts to consider:

- whether the encounter occurred in a public place;

- whether the suspect consented to speak with the officers;

- whether the officers informed the individual that he was not under arrest and was free to leave;

- whether the individual was moved to another area;

- whether there was a threatening presence of several officers and a display of weapons or physical force; and

- whether the officers' tone of voice was such that their requests were likely to be obeyed.

*United States v. Snodgrass*, 635 F.3d 324, 327 (7th Cir. 2011); *see also United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). In addition, to the factors from *Snodgrass*, the Seventh Circuit has noted that voluntarily agreeing to meet with law enforcement weighs against a custody determination, while the opposite's true if the interaction isn't voluntary. *Id.*

The Seventh Circuit has also noted that courts must determine if there are any other circumstances present that allow a court to gauge how a reasonable person would perceive the atmosphere, the questioning, and his ability to leave. *See United States v. Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012). Here, one such factor is the dimensions and layout of the interview environment. The Seventh Circuit in *Ambrose* detailed how the spaciousness of the room and public visibility of the

interview influence the analysis. There, the interview was on an "active floor with many people," the conference table seated 20, and the doors to the room were at least partially open for the duration of the interview. 668 F.3d at 957. Those characteristics contributed to a finding that Ambrose was not in custody. By contrast, in *United States v. Slaight*, the Court observed that the "minute" size of the interrogation room made the atmosphere more coercive. 620 F.3d 816, 819 (7th Cir. 2010). There, the Court held that the officer's show of force while executing a warrant, "the claustrophobic setting of a windowless room the size of a bathroom," along with the defendant's knowledge that officers had evidence against him, would cause "[a]nyone in his situation" to think himself in custody. *Id.* at 821. And this was true even though officers gave Slaight the option of refusing the interview at the station and repeatedly told him that he was free to leave. *Id.* at 819.

That's not to say that an interviewer's method or approach is a less important consideration. The content and timing of questions or comments are equally relevant to the custody determination, and the same is true of the interviewer's demeanor and tone. *United States v. Littledale,* 652 F.3d 698, 701 (7th Cir. 2011) (identifying tone of voice as a relevant consideration); *see also Stansbury v. California,* 511 U.S. 318, 325–27 (1994) (information conveyed "by word or deed" to the suspect can be relevant to the custody issue). Indeed, in *Fields* the Supreme Court held that a prison inmate was not in custody because, importantly, he was told at the

beginning and again during the interview that he was free to go back to his cell, the interview took place in a average-sized conference room with the door open at times, and he was offered food and water. *Fields*, 132 S. Ct. at 1194.

At the evidentiary hearing, Shearing painted a more complete picture of the circumstances surrounding the interview: it took place in a small, cramped room in the bowels of the jail, the room was locked from the outside for the duration, and Shearing never told Meza that he was free to refuse or to terminate the interview and return to his cell. Once she'd finished determining Meza's immigration status, she buzzed a CO to unlock the interview room and then exited the room. Tr. at 19–20. At no time during the interview did Shearing offer Meza food or water, or allow him to place a call to his attorney or family members. *Id.* And there's no indication she told Meza how long she anticipated the interview would last. When confronted with these circumstances—locked in a "claustrophobic" room for the foreseeable future, in an unfamiliar and uncomfortable environment, with a law enforcement officer who wants answers to questions having the potential to incriminate yourself and your family—anyone would think of him or herself as "in custody." *See Yarborough*, 541 U.S. at 662. ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.")

Finally, as to the objective determination, this Court should find that "the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *See Fields,* 132 S. Ct. at 1190. This was not a "temporary and relatively nonthreatening" encounter. *See Maryland v. Shatzer*, 559 U.S. 98 (2010) (finding that a traffic stop did not have the same inherently coercive character as a station house interrogation). Meza was subjected to a surprise interview in a locked room within the already coercive, uncomfortable jail atmosphere. During the interview he was asked questions with criminal implications for himself and his family members, without being informed how long the interview would last. *Miranda* safeguards are in place to protect the privilege against self-incrimination in a coercive environment like this.

**3.2 Agent Shearing interrogated Mr. Meza.**

The second inquiry is whether Meza was subjected to interrogation. Interrogation triggering *Miranda* includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). The analysis incorporates the perspectives of both the interrogator and the subject of the interrogation. *Smiley v. Thurmer*, 542 F.3d 574, 582 (7th Cir. 2008); *see also United States v. Ventura,* 947 F.Supp. 25 (D.P.R. 1996) (explaining the interrogation standard:

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"[I]f an officer should know that a question is reasonably likely to elicit an incriminating response, and a reasonable person would perceive the question as an interrogative one, there is an interrogation.")(internal citations removed).

The goal is to "spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States,* 487 U.S. 201, 213 (1988). This is no different in a situation like Meza's, where the questions relate to immigration status and the answers could carry criminal consequences. In these circumstances, courts have said that *Miranda* warnings are required where an ICE agent is inquiring as to citizenship and status in the United States. *See e.g., United States v. Mata-Abundiz,* 717 F.2d 1277, 1278 (9th Cir. 1983) ("[i]f civil investigations by the [Immigration and Naturalization Service] were excluded from the *Miranda* rule, [immigration] agents could evade that rule by labeling all investigations civil."); *United States v. Gallardo*, 58 F. Supp. 2d 1018, 1021-22 (S.D. Iowa 1999) (barring the government from introducing in its case-in-chief evidence of defendant's answers to the citizenship and alien status questions); *United States v. Aragon-Ruiz,* 551 F. Supp. 2d 904 (D. Minn. 2008) (determining that statements were admissible because defendant heard and waived his *Miranda* rights twice). Shearing wasn't seeking basic benign, biographical information from Meza, she wanted to know if he was in the U.S. illegally.

To be sure, the questions she posed to Meza related to criminal conduct. As an agent with the Immigration and Customs Enforcement, she is charged with enforcing U.S. immigration statutes, including those with criminal consequences. As she candidly acknowledged at the evidentiary hearing, the questions she posed to Meza addressed all the elements of at least two criminal offenses: illegal entry in violation of 18 U.S.C. § 1325 and illegal re-entry in violation of 18 U.S.C. § 1326. Tr. at 29–30. Whether she could ultimately establish a violation of either depended, of course, on the answers Meza provided. There's no doubt, though, that she has significant experience enforcing these and other immigration laws, and that she is aware of what constitutes criminal conduct. (Tr. at 25) (explaining that there have been times during similarly un-*Mirandized* interviews that the subject confesses to illegal re-entry, at which point the agency proceeds "down the criminal path.") According to Shearing, there is "no fool-proof way" to ensure that an un-*Mirandized* interview like Meza's doesn't result in an illegal re-entry confession. Tr. at 27.

And going into the interview, Shearing should have known that any questions related to Meza's immigration status would be reasonably likely to elicit an incriminating response. She knew that he was suspected of being here illegally. *Id.* Yet the following questions were among those she asked of Meza: "I asked him if he *had* a social security number; where he was born... whether his father was still alive or not; his mother; and her biographical information..."; "their citizenship";

12

"how did you get [to the U.S.]" Tr. at 7–8; 17–18; 29. This knowledge cannot be reconciled with Shearing's characterization of the interview as mere administrative procedure.

Rather, Shearing's questions laid the foundation for immigration-related criminal offenses, including illegal entry under § 1325. It does not matter whether the Milwaukee office of the Department of Homeland Security has policy against prosecuting one of these offenses. At the evidentiary hearing, Shearing referred vaguely to a policy but couldn't say with certainty that the policy was written, and she admitted that a prosecution could proceed notwithstanding the existence of a policy. Tr.24–26, 28. Even if a written policy exists and is followed to a tee, its existence does not stop illegal entry from being a criminal offense. After all, the fact that a criminal offense is obscure or prosecuted infrequently does not render it invalid. *See Yick Wo v. Hopkins,* 118 U.S. 356 (1886). This was an interrogation and Meza was in custody at the time. Because *Miranda* warnings were required but never provided, Meza's statements must be suppressed.

**4.0 Conclusion.**

Without providing *Miranda* warnings, Shearing asked Meza targeted questions about his citizenship knowing they'd likely cause him to admit a violation of § 1325, if not a more serious criminal offense. And she asked him these questions in a tiny locked room within the Milwaukee County Jail—an unfamiliar and undoubtedly

unnerving environment to begin with. She didn't tell him he was free to leave. She didn't offer to let him call his attorney. She didn't ask him if he was willing to answer questions. She didn't even tell him he could pause the interview to use the restroom. This type of coercive interrogation is the reason *Miranda*'s safeguards exist. All of Meza's statements stemming from the unwarned custodial interrogation must be suppressed. *Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates" the use of the Miranda safeguards.); *see also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (the burden of showing admissibility rests on the prosecution).

Dated this 3rd day of January, 2014.

> Respectfully submitted,
> MARIANO A. MEZA, Defendant
>
> */s/ Julie K. Linnen*
> Julie K. Linnen

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org