UNITED STATES OF AMERICA,

    Plaintiff,

  v.

                                      Case No. 13CR192 (RTR/WEC)

MARIANO A. MEZA,

    Defendant.

**DEFENDANT'S OBJECTION TO
THE MAGISTRATE JUDGE'S RECOMMENDATIONS**

Mariano Meza, by counsel, objects to the Magistrate Judge's recommendation on his motion to dismiss for failure to allege an element of the offense (dkt. 12), his motion to dismiss on Second Amendment grounds (dkt. 13), and his motion to suppress statements (dkt. 14). He requests an order dismissing the indictment. If the indictment is not dismissed, he then requests an order be entered suppressing all statements obtained during an un-*Mirandized* interview by law enforcement.

    **1.0    The indictment must be dismissed because it fails to allege that Meza possessed the requisite mens rea.**

The issue here is straight forward: the indictment must be dismissed because it fails to allege that Meza *knowingly* possessed ammunition as an "alien… illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5) and 18 U.S.C. § 924(a)(2). It is § 924(a)(2) that provides the mental state and penalty associated

with a violation of § 922(g)(5). It states that "[w]hoever *knowingly* violates subsection ... (g)... of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." (emphasis added). There are two non-jurisdictional elements to § 922(g)(5): (1) status as an alien illegally or unlawfully in the United States, and (2) possession of a firearm or ammunition. The indictment does not allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5)—that he knew (1) he possessed ammunition *and* (2) that he was an illegal immigrant. Because this required element was omitted, the indictment fails to conform to minimal constitutional safeguards and must be dismissed.

To charge and to prove a violation of § 922(g)(5) and § 924(a)(2), the government must present evidence that Meza knew the facts establishing his prohibited status. The indictment in this case fails to allege the requisite knowledge. Given its wording, the indictment gives no indication that the grand jury was asked to find and in fact found probable cause as to this element of the offense. *See United States v. Calandra,* 414 U.S. 338, 343 (1974) (the grand jury's role is to determine whether there is probable cause to believe a crime has been committed and to protect citizens against unfounded criminal prosecutions). The indictment charges that Meza:

> being an alien illegally and unlawfully in the United States, knowingly possessed ammunition which, prior to his possession of it, had been transported in interstate commerce, and the possession of which was therefore in an affecting commerce.
2

Dkt. 1. As it is worded, the indictment does not allege that Meza knew the facts establishing his prohibited status. The allegation related to Meza's prohibited status precedes the use of the word "knowingly." "Knowingly" in the indictment modifies only Meza's possession of the bullet. This placement of the adverb cannot be read as implying the scienter for the previously alleged element.

The resulting indictment must allege all the elements of the charged crime. *Jones v. United States*, 526 U.S. 227, 232 (1999); *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998). That is, an indictment must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Carll*, 105 U.S. 611, 612 (1881). So it follows that Rule 7(c)(1) of the Federal Rules of Criminal Procedure demands "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

And, of course, every element of the crime must be presented to the jury and proven beyond a reasonable doubt. *See Jones*, 526 U.S. at 232. But this requirement "is in addition to the indictment's including every element, not instead of it." *United States v. Edwards*, 111 F. Supp. 2d 1057, 1061 (E.D. Wis. 2000) (*citing Jones*, 526 U.S. at 232). Generally it is sufficient for the indictment to parrot the words of the statute itself. *See United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999). But as the court observed in *Edwards*, this "does not on its own satisfy the requirement that the

3

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.
Case 2:13-cr-00192-RTR   Filed 03/11/14   Page 3 of 20   Document 28

indictment must charge every element of the crime" unless "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Edwards,* 111 F. Supp. 2d at 1063.

Here, the indictment alleges that Meza acted knowingly but only in possessing the ammunition. It ignores the other element of § 922(g) that is applicable here—his status as an illegal or unlawful alien. 18 U.S.C. § 922(g)(5). Even though the indictment contains the word "knowingly" as a technical matter, it is not worded in a way that alleges that Meza possessed the requisite mens rea as to both elements of § 922(g)(5).

To be clear, Meza is not arguing that the government is required to allege and prove that he knew his immigration status prohibited him from possessing a gun. And he is not arguing that the government must set forth in detail the facts he knew that would establish his prohibited status. But the indictment must allege that he knew those facts, along with knowing he possessed ammunition. The Magistrate Judge agrees that the government is required to prove at trial Meza's knowledge as to the facts supporting both of these elements of § 922(g)(5). *See* dkt. 27 at 5. The government was required to establish probable cause of the same to obtain the indictment: "the prosecutor must persuade the grand jury that the accused's acts and state of mind fulfilled all the elements of the offense." *United States v.*

*Resendiz-Ponce*, 549 U.S. 102, 115 (2007) (Scalia, J., dissenting). In this case, the indictment fails to allege that Meza's acts and state of mind fulfilled the elements of the offense. At best, there is uncertainty and ambiguity surrounding the mens rea element. What matters is this: there is no indication from the indictment that the grand jury was asked to find that Meza's acts and state of mind fulfilled all the elements of the offense.

Thus, Meza moves under the Fifth and Sixth Amendments and Rules 7 and 12(a) of the Federal Rules of Criminal Procedure, for an order dismissing the one-count indictment because it fails to sufficiently allege an element of the offense.

### 2.0 The indictment must be dismissed because 18 U.S.C. § 922(g)(5) is unconstitutional.

Meza makes both a facial and an as-applied constitutional challenge to 18 U.S.C. § 922(g)(5). The facial challenge explains that the complete ban in § 922(g)(5) on all illegal aliens possessing firearms is overbroad and thus violates the Second Amendment. The as-applied challenge contends that the ban in § 922(g)(5) violates Meza's Second Amendment rights.

### 2.1 Illegal aliens are not categorically excluded from "the people" protected by the Second Amendment.

Words have meaning. And when the same words are used in the same document, they are given the same meaning—unless that is expressly stated otherwise. *See Parker v. District of Columbia*, 478 F.3d 370, 382 (D.C. Cir. 2007); *see also*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

*Fla. Dept. of Rev. v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 39 (2008) (noting "identical words used in different parts of the same act are intended to have the same meaning" (quotation omitted)). Here, the analysis and argument are controlled by words the Constitutional Convention chose when drafting the Bill of Rights. The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The First, Second and Fourth Amendments all use the term "the people"—a term of art—and many courts have found that it means the same thing in each amendment. *United States v. Emerson*, 270 F.3d 203, 227–28 (5th Cir. 2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Parker*, 478 F.3d at 381; *Nordyke v. King*, 364 F.3d 1025, 1028–29 (9th Cir. 2004) (Gould, J., dissenting from denial of rehearing en banc). Courts have reached this conclusion by comparing the language, structure, and purpose of the three amendments. Of course, the First, Second, and Fourth Amendments were ratified at the same time. And they all serve the same purpose: to limit government infringement of a right that existed before the ratification of the Constitution. In doing so, each amendment also recognizes who posses that right—it is "the right of the people."

The Supreme Court recognized that fact in *United States v. Verdugo-Urquidez*, stating: "'the people' seems to have been a term of art employed in select parts of the Constitution," referring to those who are "protected by the Fourth Amendment, and

by the First and Second Amendments." 494 U.S. 259, 265 (1990). And so it is not surprising that courts have uniformly held that the protections of the First and Fourth Amendments extend to individuals with a substantial connection to the United States. And under this test, illegal aliens can be considered among "the people." The seminal case ascribing a precise meaning to the term "the people" arose in the context of a Fourth Amendment claim. *See Verdugo-Urquidez*, 494 U.S. at 265. There the Supreme Court found:"'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265; *see also Heller*, 554 U.S. at 580 (discussing *Verdugo-Urquidez*). In *Verdugo-Urquidez*, the defendant's home in Mexico was searched shortly after he was arrested and brought to America. 494 U.S. at 262. He claimed that the Fourth Amendment's protections extended to his home in Mexico. The Supreme Court rejected that argument, but before doing so, it gave a detailed analysis of the Fourth Amendment and the term "the people."

Meza, as a non-citizen, is among "the people" under the analysis set forth in *Verdugo-Urquidez,* 494 U.S. at 262. He is voluntarily present in the United States and has accepted "some societal obligations." *See id.* at 273. More specifically, he is a

long-time resident of Milwaukee. He attended elementary, middle and high school in the Milwaukee Public Schools. He has two children here. *See* dkt. 21, exh. 1. His mother lives here. *Id.* And for all of his adult life he has lived here. Thus, Meza is among "the people" whom the Second Amendment guarantees the right to bear arms.

The Magistrate Judge's fatal mistake rested in his belief that *Heller* should be read to exclude Meza from Second Amendment protection simply because of his immigration status. Some courts, including the Fifth Circuit in *United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011), have relied on *Heller* to find that under the Second Amendment illegal immigrants are not included in "the people."[1] But this was not the issue in *Heller* and it's improper to read an "unwritten holding" into the opinion. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (refusing to read an unwritten holding into *Heller*: "the question in *Heller* was the amendment's raison d'être—does it protect an individual or collective right?—and aliens were not part of the calculus."); *Fletcher v. Haas,* 851 F. Supp. 2d 287, 297 (D.

---

[1] The Fifth Circuit panel in *Portillo-Munoz* was divided on the issue. *Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011); *but see id*. at 442-43 (Denis, J. dissenting). In a half-page per curiam opinion, the Eighth Circuit followed the Fifth. *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011). Though initially the Fourth Circuit remanded a challenge to § 922(g)(5) for the district court to decide what level of scrutiny to apply, *United States v. Guerrero-Leco*, 446 Fed. Appx. 610 (4th Cir. 2011), it eventually concluded that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012). *United States v. Lewis*, 2010 WL 337 0754, at *3 (N.D. Ga. May 26, 2010); *United States v. Yanez-Vasquez*, 2010 WL 411112, at *2 (D. Kan. Jan. 28, 2010).

Mass. 2012) ("[T]he issue in Heller was not the scope of the term 'the people,' but whether the Second Amendment protected a collective or an individual right.") Indeed, the Supreme Court emphasized that *Heller*'s holding was limited and that "one should not expect [the opinion] to clarify the entire field." *Id.* at 635.

Ultimately, the Supreme Court determined in *Heller* that the Second Amendment secures an individual right—like the First and Fourth Amendments. At no time did the Supreme Court address whether a non-citizen is protected by the Second Amendment. That question has been left open and should be decided in Meza's favor; just as the First and Fourth Amendment protect illegal immigrants with substantial connections to the United States, so too does the Second Amendment. Once this is established, the question becomes whether § 922(g)(5) unconstitutionally infringes on Meza's right to bear arms.

### 2.2 Section 922(g)(5) is facially unconstitutional.

The Seventh Circuit has yet to consider whether § 922(g)(5)'s ban passes constitutional muster in light of the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). As an initial matter, there is no question that § 922(g)(5) abridges Meza's Second Amendment rights—the statute keeps him from possessing a gun or ammunition. He cannot exercise his right to bear arms if he can't possess a gun or the bullets to use one—after all, a gun is of little use if it can't be used.

The remaining issue is whether § 922(g)(5) is a constitutionally permissible restraint of that right. The analysis is two-fold. *See United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). First, is the defendant part of a group that is categorically banned from possessing a firearm? Here, the defendant is: § 922(g)(5) nullifies the Second Amendment for him and all illegal aliens. Second, can the government show that the categorical ban is constitutional? *Williams*, 616 F.3d at 692. As the Seventh Circuit explained in *Williams*, "the government does not get a free pass simply because Congress has established a 'categorical ban'; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself." *Id.*

The government has failed to meet its burden here — under whatever form that burden takes. At the very least, the government must meet some form of heightened scrutiny. *See Skoien*, 614 F.3d at 641 (en banc) (the Court noted that "[t]he United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective."). The ban under § 922(g)(5) is different from the categorical prohibitions examined in *Skoien* and *Williams* and *Yancey*. In *Skoien*, the challenged ban on firearm possession was for those convicted of domestic abuse; in *Williams*, the challenged ban was for convicted felons; and in *Yancey*, the challenged ban was for drug users. In a challenge like this, the analysis

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

starts with the nature of the ban: that is, what is the government's objective in creating that ban. *Williams*, 616 F.3d at 693. In *Skoien* and *Williams* the court upheld the ban because there was something inherently dangerous about the class of persons banned—felons and those convicted of domestic violence. While not every felon who cannot possess a firearm is dangerous, as a general class, society was and is safer by keeping guns out of those persons' hands. *Id; Skoien*, 614 F.3d at 642.

The ban at issue in *Yancey* is similar: Congress had a specific objective—namely, "suppressing armed violence." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010). In upholding that ban, the court focused on the close parallels between prohibitions targeting the mentally ill, felons, and habitual drug users. *See id.* ("Keeping guns away from habitual drug abusers is analogous to disarming felons."); *and id.* at 685 ("Moreover, habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms."). The possession of a firearm by persons from each group poses a real and self-evident threat to society. *Id.* at 686.

But the same cannot be said of the ban at issue in § 922(g)(5). It can't be said that illegal immigrants as a general class are inherently dangerous. The government has not presented evidence establishing otherwise. Here, the Magistrate Judge tried to bridge that gap by speculating that illegal immigrants are not, as a class, virtuous people to whom the Second Amendment protections encompass. Dkt. 27 at 8. First,

11

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:13-cr-00192-RTR   Filed 03/11/14   Page 11 of 20   Document 28

virtue or the lack thereof has never been the test for whether someone is afforded Constitutional protections. If it were, evidence from a drug case or a robbery or really any crime would not be suppressed. A commission of a crime naturally militates against society recognizing someone as virtuous. That's not to mention the protections afforded in the First Amendment. Shakespeare and pornography, the ballet and strip clubs, a Neighborhood Watch meeting and a protest at a combat veteran's funeral, a Sunday church service and a gathering of Satanists, all enjoy the same protection under the First Amendment. *See e.g., Snyder v. Phelps,* 562 U.S. \_\_\_, 131 S.Ct. 1207 (2011). A value judgment about virtue, or a lack of it, cannot be the basis for stripping Constitutional protections.

Because the government cannot point to an important governmental objective underlying § 922(g)(5)'s ban, nor can it establish that prohibiting illegal immigrants from possessing firearms furthers an important governmental interest, the defendant's motion must be granted and § 922(g)(5) struck down as unconstitutional.

### 2.3 Section 922(g)(5) is unconstitutional as applied to Mr. Meza.

Under the standard applied by the Magistrate Judge— intermediate scrutiny —§ 922(g)(5) must be found unconstitutional as applied to Meza. Under that standard, it is the government's burden to demonstrate that the statute's objective "is an important one" and that it "is advanced" by "substantially related" means.

*United States v. Williams,* 616 F.3d 685, 692 (7th Cir. 2010). Whether a statute meets this standard in any given case must be determined based on "the facts of the present case." Dkt. 27 at 10, citing *United States v. Phillips,* 645 F.3d 859, 863 (7th Cir. 2011).

The Seventh Circuit has said that the purpose of § 922(g) is "to keep guns out of the hands of presumptively risky people and that "[its] broad objective—suppressing armed violence — is without a doubt an important one." *Yancey,* 621 F.3d at 863. *Yancey* involved a challenge to § 922(g)(3) (drug user in possession of a firearm), and the Court relied on evidence to support the link between drug use and risky, violent behavior involving guns. The government cannot discharge its burden here by simply asserting that individuals "illegally and unlawfully in the United States," and Meza in particular, qualify as "presumptively risky."

The Magistrate Judge relies on the Fifth Circuit's reasoning in *Portillo-Munoz*, 643 F.3d at 441, to lump illegal aliens into the category of "presumptively risky people." Dkt. 27 at 10. Illegal aliens, according to the court, "are likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." *Portillo-Munoz,* 643 F.3d at 441 (quoting *United States v. Toner,* 728 F.2d 115, 128-29 (2d Cir. 1984)). But what remains unclear is the link between these broad generalizations and armed violence. It seems just as likely that individuals without

legal status would try to avoid run-ins with law enforcement—especially violent or brazen behavior—to minimize the risk of detection and deportation. What's more, entering the United States without inspection—illegal entry—is a non-violent misdemeanor. But under the Magistrate Judge's interpretation Meza, along with many others, became "presumptively risky" by allegedly committing the non-violent misdemeanor offense of illegal re-entry and then remaining here. It is the government's burden to demonstrate that there's an important governmental interest at work here, but all it has offered, and all the Magistrate Judge relied on, are broad generalizations.

Even if these broad generalizations are enough to demonstrate an important governmental objective, the statute is not substantially related to advancing that objective here. This case involves the following facts: Meza is a longtime resident of Milwaukee where he is now raising his two children. *See* Dkt. 21, exh. 1. He attended school here and has extended family in the area. Before his arrest, his permanent residence was on Burnham Street in Milwaukee which he reported to law enforcement. *See id.* He had never been deported before and to this day does not have an A-File with ICE. On August 24, 2013, he was arrested with one .22 caliber cartridge in his back pocket. *See* dkt. 1 (charging Meza with possessing one cartridge). He has never been convicted of a felony and has never been caught using drugs, though a CCAP search does reveal one prior conviction: five years before this

incident, he was convicted of misdemeanor resisting or obstructing an officer. *See also* dkt. 6. He does have misdemeanor charges currently pending, but he is presumed innocent of those, as is true of prior charges that were dismissed by the State and prior arrests that never resulted in charges. He did not have a gun when he was arrested and has never been convicted of committing armed violence.

Given these facts, banning Meza from possessing one bullet does not advance in a substantially-related manner the goal of preventing armed violence, if this is in fact an important governmental interest. Because the government has not and cannot meet its burden to prove otherwise, § 922(g)(5) is unconstitutional as applied to Meza and the indictment should be dismissed.

### 3.0 Meza's statements must be suppressed because those statements were made during a custodial interrogation without the protection of *Miranda.*

Agent Shearing with Immigration and Customs Enforcement interviewed Meza at the Milwaukee County Jail two days after he was arrested on state charges. There is no question that Meza was in custody at the time. Dkt. 27 at 15. During that interview, Shearing questioned Meza about his alienage, his parents' immigration status, his place of birth, and his entry into the United States. Shearing went into the interview suspecting that Meza was in the United States illegally. Tr. at 8; dkt. 27 at 12.

This interview did not take place as a matter of course: Shearing was directed by Agent Dykema specifically to interview Meza based on a tip from local law enforcement. Dkt. 27 at 11; Tr. at 32-33. Shearing admitted at the evidentiary hearing that her questions of Meza could establish the elements of both illegal entry (18 U.S.C. § 1325) and illegal re-entry (18 U.S.C. § 1326), and that she can refer cases for prosecution. Tr. at 18-19, 29–30; dkt. 72 at 13. Whether she could ultimately establish a violation of either depended, of course, on the answers Meza provided. There's no doubt, though, that she has significant experience enforcing these and other immigration laws, and that she is aware of what constitutes criminal conduct. *See* Tr. at 25 (explaining that there have been times during similarly un-*Mirandized* interviews that the subject confesses to illegal re-entry, at which point the agency proceeds "down the criminal path"). According to Shearing, there is "no fool-proof way" to ensure that an un-*Mirandized* interview like Meza's doesn't result in an illegal re-entry confession. Tr. at 27; dkt. 27 at 13-14. One preventative measure, of course, would be that the agent give *Miranda* warnings before every such interview.

Even though that would be the best course of action, there is no blanket demand. Rather, the question is whether, under these facts, Shearing's questioning constituted custodial interrogation triggering *Miranda*'s safeguards. A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action

16

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:13-cr-00192-RTR   Filed 03/11/14   Page 16 of 20   Document 28

in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Court clarified that questioning for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.

The focus in determining whether words or actions are "reasonably likely to elicit an incriminating response" is primarily upon the perceptions of the suspect, rather than the intent of the police. *Id.* at 301(footnotes omitted); *see also Illinois v. Perkins,* 496 U.S. 292, 296 (1990). The Magistrate Judge focused instead on the agent's perception of the situation, (*see* dkt. 27 at 18-29), when it is Meza's point of view that matters under *Miranda* and *Innis.*

The goal of *Miranda,* after all, is to "spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government." *Doe v. United States,* 487 U.S. 201, 213 (988). Shearing wasn't seeking basic benign, biographical information from Meza — this type of information had already been obtained when Meza was booked into jail two days earlier. Rather, she wanted to know if he was in the U.S. illegally. Her questioning laid the foundation for immigration-related criminal offenses, including illegal entry under § 1325 and illegal re-entry under § 1326. *United States v. Gallardo*, 58 F. Supp. 2d 1018, 1021-22 (S.D. Iowa 1999)

17

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:13-cr-00192-RTR   Filed 03/11/14   Page 17 of 20   Document 28

(barring the government from introducing in its case-in-chief evidence of defendant's answers to the citizenship and alien status questions); *United States v. Aragon-Ruiz,* 551 F. Supp. 2d 904 (D. Minn. 2008) (determining that statements were admissible because defendant heard and waived his *Miranda* rights twice). Again, these were targeted questions of Meza relating to his immigration status. And Shearing asked him these questions in a tiny locked room within the Milwaukee County Jail—an unfamiliar and undoubtedly unnerving environment to begin with. She didn't tell him he was free to leave. She didn't offer to let him call his attorney. She didn't ask him if he was willing to answer questions. She didn't give him an opportunity to ask questions of her until she was finished with her questioning. She didn't even tell him he could pause the interview to use the restroom. This type of coercive interrogation is the reason *Miranda*'s safeguards exist.

Finally, it does not matter whether the Milwaukee office of the Department of Homeland Security has policy against prosecuting § 1325 offenses. At the evidentiary hearing, Shearing referred vaguely to a policy but couldn't say with certainty that the policy was written, and she admitted that a prosecution could proceed notwithstanding the existence of a policy. Tr. 24–26, 28. There is no such policy in evidence in this case. And even if a written policy exists and is followed to a tee, its existence does not stop illegal entry from being a criminal offense. After all, the fact that a criminal offense is obscure or prosecuted infrequently does not render

it invalid. *See Yick Wo v. Hopkins,* 118 U.S. 356 (1886). And it also does not matter whether Shearing would have paused the interview to recite *Miranda* warnings had Meza admitted to illegally re-entering the United States — an offense that is frequently prosecuted. *Miranda* warnings serve no purpose when given after the fact; they're intended as a prophylactic, not a cure or a remedy. *See Missouri v. Seibert,* 542 U.S. 600, 604 (2004) (observing that "[a] midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda's constitutional requirement," rendering "a statement repeated after a warning in such circumstances [] inadmissible.")

This was an interrogation and Meza was in custody at the time. Because *Miranda* warnings were required but never provided, Meza's statements must be suppressed. *Miranda*, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates" the use of *Miranda*'s safeguards.); *see also Brown v. Illinois*, 422 U.S. 590, 604 (1975) (the burden of showing admissibility rests on the prosecution).

**4.0    Conclusion.**

The indictment in this case fails to allege that Meza possessed the requisite mens rea as to both elements of § 922(g)(5). Because this required element was omitted, the indictment fails to conform to minimal constitutional safeguards and

19

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:13-cr-00192-RTR   Filed 03/11/14   Page 19 of 20   Document 28

must be dismissed. In addition, the indictment must be dismissed because § 922(g)(5) is unconstitutional, both facially and as applied to Meza. Finally, all of Meza's statements stemming from the unwarned custodial interrogation must be suppressed.

Dated this 11th day of March, 2014.

> Respectfully submitted,
> MARIANO A. MEZA, Defendant
>
> */s/ Julie K. Linnen*
> Julie K. Linnen

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
222 West Washington Avenue, Suite 680
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
julie_linnen@fd.org